# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

JOSHUA F. YOUNG,

    Plaintiff,

       v.

COLORADO DEPARTMENT OF
CORRECTIONS; MOSES "ANDRE"
STANCIL; and JILL HUNSAKER RYAN,

    Defendants.

No. 23-cv-1688

**COMPLAINT FOR RELIEF,
INCLUDING DECLARATORY AND
INJUNCTIVE RELIEF**

---

Joshua Young was a rising star at the Colorado Department of Corrections. After starting as a Corrections Officer at Limon Correctional Facility in 2017, he quickly rose to the position of Housing Sergeant in 2019. In that position, Young ran a close-custody unit in one of the most challenging prisons in Colorado. In 2020, he took the position of Visiting Sergeant, where his job was to ensure the safety of both prisoners and visitors during visitation periods. His job and his safety, along with the safety of colleagues, prisoners, and guests, depended on making smart decisions and treating people equally, regardless of their race or skin color.

Unfortunately, the Colorado Department of Corrections had different ideas. It announced that Young and his colleagues had to review official training, referred to as "Equity, Diversity, and Inclusion" training. The training insisted, among other things, that all Caucasians are racist, that they perpetuate white supremacy, that the very notion of race was invented by white people to justify the oppression of people of color, that white supremacy is an ever-present feature of daily life in the United States, and that Caucasians who deny their own racism are merely "fragile" racists who cannot accept their own prejudice. Indeed, the Colorado prison system's forced

training wanted its employees to internalize these messages, to the detriment of prison safety, and to create a culture of distrust among its hard-working officers. *See* Exhibits 1-4 (Transcripts of Modules 1, 2, 3, and 4).

The result was that Young suffered discrimination in his employment, under Title VII and 42 U.S.C. § 1981. And if he is reinstated as part of the relief available in this case, he will once again be subjected to the discriminatory training materials prepared by Defendants, unless he obtains relief under 42 U.S.C. § 1983.

### <u>Statement of Related Case</u>

Plaintiff initially brought suit in January 2022. *See Young v. Colorado Department of Corrections*, 22-cv-00145-NYW-KLM (D. Colo., Jan. 19, 2022). In that case, Young alleged hostile work environment discrimination under Title VII, and sought injunctive relief under 42 U.S.C. § 1983. That case was dismissed by Judge Nina Wang, without prejudice. *See* Order on Motion to Dismiss in *Young v. Colorado*, (Feb. 3, 2023) (Exhibit 5), at 26 ("Plaintiff's hostile work environment claim is **DISMISSED without prejudice** for failure to state a claim); *see id.* ("Plaintiff's equal protection claim is **DISMISSED without prejudice** for lack of subject matter jurisdiction.") (bold in original).

However, despite dismissing without prejudice, Judge Wang did not grant leave to amend, and immediately entered judgment, and directed the Clerk of Court to terminate the case. *Id.* at 26 ("The Clerk of the Court is **DIRECTED to TERMINATE** the case.") (bold in original). Notably, Young has appealed that ruling, given that he believes that he adequately stated a claim for relief, and that, at a minimum, leave to amend the earlier complaint should have been granted. In any

event, however, Young brings this complaint, given that his claims were dismissed without prejudice, and remain within the statute of limitations.

To be clear, Young includes factual allegations below that were not in his prior complaint. This is because Defendants and the District Court have both asserted that there were gaps in Young's earlier complaint. None of the allegations are inconsistent with Young's prior allegations, and Young is prepared to swear under oath with respect to each allegation at his deposition.

## PARTIES

1.      Plaintiff Joshua F. Young resides in Colorado Springs, in the District of Colorado.

2.      Defendant Colorado Department of Corrections is the principal department of the Colorado state government that operates the state prisons.

3.      Defendant Moses "Andre" Stancil is the Executive Director of the Colorado Department of Corrections. He is sued in his official capacity.

4.      Defendant Jill Hunsaker Ryan is the Executive Director of the Colorado Department of Public Health & Environment, which created and/or promulgated some or all of the training materials used by the Colorado Department of Corrections. She is sued in her official capacity.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this complaint under 28 U.S.C. §§ 1331 and 1343 because this case presents a substantial question of federal law, specifically whether Defendants' discriminatory training materials created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq. and 42 U.S.C. § 1981, and

violated the Equal Protection Clause of the Fourteenth Amendment to the U.S.
Constitution, such that a cause of action may be brought under 42 U.S.C. § 1983.

6.    This Court has authority to issue a declaratory judgment and to order injunctive relief and
other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

7.    Venue is appropriate in this district under 28 U.S.C. § 1391.  A substantial part of the events
giving rise to this claim occurred in this district, and Defendants maintain one or more
offices and employees in this district.

**Facts**

8.    In February 2021, the Colorado Department of Corrections announced that all CDOC
employees were required to take an Equity, Diversity, and Inclusion (EDI) training.

9.    Young took the annual training in March 2021, soon after being assigned because his boss
appreciated his work ethic. Like all other assigned training, the material from the EDI
training was expected to be used every day at work.

10.   The EDI training contained several computer modules, with employees like Young
working through materials like those described below.

11.   First, Young's EDI training began with a review of "a glossary of terms assembled by
CDPHE's Health Equity Office." *See* Exhibit 6.

12.   The glossary displayed the official markings of the State of Colorado and CDPHE, along
with the Office of Health Equity:



Exhibit 6, at STATE_000245.

13.   The glossary was meant not just to be read as part of the mandatory EDI training, but to be implemented, by providing a "common language" for Young, his colleagues, and any others taking the EDI training:

In an effort to provide common language, the Office of Health Equity has compiled a list of terms relevant to the work and movement to advance equity. Take note that evolving language is a positive sign in social justice movements. To that end, this list will be modified on an ongoing basis.

If a term exists that you'd like to further explore or you don't quite agree with, we encourage you to browse the internet for additional articles, blogs, etc. on the topic. Just as language evolves over time, our opinions and beliefs may also evolve.

**Ableism:** The discrimination of and social prejudice against people with disabilities based on the belief that typical abilities are superior. It is rooted in the assumption that disabled people require "fixing" and defines people by their disability. Like racism and sexism, ableism classifies entire groups of people as "less than," and includes harmful stereotypes, misconceptions, and generalizations of people with disabilities.
*Adapted from Access Living

**Ally:** Someone from a dominant group (who experiences unearned access and/or power) who acts in support of non-dominant group members. Allies practice genuine **allyship**. That is, they take action, reflect on their own thinking and beliefs, seek out learning opportunities, take initiative in interpersonal relations, and work to create systems of equity.

**Anti-Racism:** Some form of focused and sustained action, which includes inter-cultural, inter-faith, multi-lingual and inter-abled (i.e., differently abled) communities with the intent to change a system or an institutional policy, practice, or procedure which has racist effects.
*Adapted from the Anti-Racism Digital Library

**BIPOC:** Acronym for Black, Indigenous People, and People of Color; the term is used to acknowledge that Indigenous and Black people have been most impacted by whiteness, both historically and in the present day. This

STATE_000246

Exhibit 6, at STATE_000246.

14.    The terms defined in the glossary were explicitly meant to be used and adopted by CDOC employees—beyond merely for the purposes of taking the EDI training—to further the goals of advancing "equity." *Id.* ("Take note that evolving language is a positive sign in social justice movements.").

6

15.    If employees disagreed with the contents of the glossary, it was obvious that eventual conformity was nevertheless necessary: "Just as language evolves over time, our opinions and beliefs may also evolve." *Id.*

16.    Employees were expected to apply the lessons of the training to their day-to-day work. Exhibit 16 ("How do I include EDI in my work? In this module you will explore ways to challenge and disrupt bias within your team, become familiar with EDI-specific expectations for all employees, and familiarize yourself with the resources available (both internal and external) to help support EDI policy and foster a safe, equitable workplace for all.").

17.    The glossary provided Young the meaning of certain EDI terms in grossly offensive language, targeted at Caucasian employees specifically. For instance, the definition of "BIPOC" adopted the term "whiteness" to describe how "Indigenous and Black people have been impacted" most by whiteness, and how whiteness has shaped "the experiences of and relationship to white supremacy for all people of color within a U.S. context."



Exhibit 6, at STATE_000246-47.

18.    Defendants' state-sanctioned training therefore implied a direct relationship between "whiteness" and "white supremacy," which it contends presently affects all people of color in the United States."

19.    Similarly, the official definition of "race" for the EDI trainings similarly blamed "white people" like Young for creating the very idea of race "to justify social economic oppression of people of color by white people."



**Race:** A social construct that artificially groups people by skin tone and other physical traits. The concept, which has no genetic or scientific basis, was created and used to justify social and economic oppression of people of color by white people.
*Adapted from Luna Jiménez Institute for Social Transformation

**Racial Equity:** A social framework in which institutions and systems give

010                                                                    STATE_000254

Exhibit 6, at STATE_000254.

20.    In other words, every time the EDI modules or other training materials referred to race, racial discrimination, or racial diversity, takers of the training were meant to recall this initial part of the mandatory training and use the glossary's definition of "race" as their "common language." Exhibit 6, at STATE_000254 ("[T]he following definitions are to be used as background information for the training.").

21.    The glossary also defined a term called "White Exceptionalism," which apprised Young of the fact that he perpetuated white supremacy solely due to his Caucasian race, regardless of his individual actions. Indeed, because Young has never actually been a white

supremacist, the training apprised him that it had concluded that as a white person, Young is "more interested in not seeming racist than actually improving the lives of people of color." Unless he acknowledged his part in perpetuating white supremacy, Young could never sufficiently support equity, only "fakequity."

**White Exceptionalism:** The belief held by some white allies that they are the exception to white racism even though they fail to address the implicit ways in which they perpetuate white supremacy. These individuals are often more interested in not seeming racist than actually improving the lives of people of color. This is sometimes referred to as **fakequity** (Erin Okono).
*Adapted from *Me and White Supremacy: Combat Racism, Change the World, and Become a Good Ancestor* by Layla Saad

Exhibit 6, at STATE_000258.

22.    The EDI training also announced that when a white person like Young is confronted "by information about racial inequality and injustice," he or she will invariably experience "[d]iscomfort and defensiveness, often triggered by fear or guilt."

**White Fragility:** Discomfort and defensiveness, often triggered by feelings of fear or guilt, on the part of a white person when confronted by information about racial inequality and injustice.

*Id.*

23.    The glossary also defined the phrase "White Supremacy." But far from describing radicals like Neo-Nazis, skinheads, or members of the Ku Klux Klan, the glossary pronounced broadly that White Supremacy is "institutionally perpetrated" by Caucasian people. Exhibit 6, at STATE_000258 (White Supremacy is an "*institutionally perpetrated* system of exploitation and oppression of nations and people of color by *white peoples of European*

*descent* for the purpose of establishing, maintaining, and defending a system of wealth, power, and privilege.").



*Id.* (emphasis added).

24.    For good measure, the training explained why the word "Black" is capitalized in the EDI training, and ought to be capitalized generally, "to convey a shared sense of history and identity among people in the African diaspora and within Africa." It further explained why the EDI training, as well as state employees, did not and should not capitalize the word "white." The racial groups had to be treated differently, said the EDI training, so as to avoid a "symbolic nod to white supremacy."

**A note on capitalizing "Black"**

When referring to a person or community, "Black" is capitalized to convey a shared sense of history and identity among people in the African diaspora and within Africa. This puts the term on equal racial, ethnic, and cultural footing as terms like Latinx, Asian American, American Indians & Alaska Natives, etc.

While some publications have also chosen to capitalize "white", many others have taken a stance against this on the principle of equity. Capitalizing "white" could be seen as a symbolic nod to white supremacy, and it's important to note that the majority of white Americans do not see themselves as a collective ethnic group the same way that Black Americans do.

Front cover images credit (clockwise from top left): @dukdukpaint via Picuki, Porry Grono/Getty Images, shauni/Getty Images, Oleksii Liskonih/Getty Images, HowLettory/Getty Images, Clay Banks/Getty Images, Mapping Inequality

**COLORADO**
Office of Health Equity
Department of Public Health & Environment

STATE_000259

Exhibit 6, at STATE_000259.

25.    The word "race" or one of its variants—defined by the glossary as invented by Caucasians to oppress non-Caucasians—was used innumerable times, throughout the EDI training. *See, e.g.*, Exhibit 1, at 5 (Module 1) ("Social factors that impact quality of life are: Identity, often racial or ethnic background."); *id.* at 7 ("Property values were determined by race.");

*id.* at 12 ("[R]acial and income inequality actually hinders economic prosperity…");
Exhibit 3, at 3 (Module 3) ("The most well-documented inequities throughout history are
based on race, and so these are the ones that we are able to highlight most often.") *see also*
Exhibit 4, at 4 (Module 4) ("Racial Equity Tool"). This is a small sub-sample of the times
where the modules referred to "race."

26.    Indeed, based on the four modules that followed, Young and other employees were
instructed to have <u>more</u> conversations about race in the workplace. *See, e.g.*, Exhibit 4, at
4 (Module 4) ("One theory of change requires normalizing conversations about race."); *id.*
at 6 ("The intention of this course is to bring awareness to EDI and how it can be applied
to the work that you do as a state employee.").

27.    Each of these conversations were supposed to apply the EDI training's definition of race;
which, of course had been offered by the "common language" in the glossary. Exhibit 4, at
4 (Module 4) ("One theory of change requires normalizing conversations about race,
making sure we have a shared understanding of commonly held definitions of implicit bias
and institutional and structural racism.").

28.    The modules instructed Young and his colleagues that even the most routine of decisions,
they needed to take account of race. Exhibit 4, at 4 (Module 4) ("We must also
operationalize racial equity, integrating racial equity into our routine decision-making
processes and development and implementation of measurable actions."); Exhibit 4, at 6
(Module 4) ("We know we presented a lot of information in this program, but you should
know that you are not alone in the journey to understand inequities and to make a difference
through your role in state government.").

29.     The trainings also directed further insults at Caucasians. For instance, in Module 3, the trainings described the definition of cultural appropriation, noting that its occurrence is based on "white" dominance. Exhibit 3, at 15 (Module 3)

Be aware of arts that appropriate culture and do not accurately portray the people from that culture. Cultural appropriation is defined as: the theft of cultural elements for one's own use, commodification, or profit—including symbols, art, language, customs, etc.—often without understanding, acknowledgment, or respect for its value in the original culture. *Results from the assumption that a dominant (i.e. white) culture's right to take other cultural elements.*

(emphasis added).

30.     The language of "dominance" is reflected in other portions of the training, including one portion about "Ideological Oppression." *See, e.g.*, Exhibit 2, at 14 (Module 2) ("Ideological oppression starts when the *dominant group* associates positive qualities with itself and negative qualities with the marginalized or the othered group.") (emphasis added).

31.     The implication from describing Caucasians as the dominant group is that Caucasians like Young, alone, are responsible for ideological oppression of "marginalized" and "othered" groups.

32.     Young and his colleagues were instructed that he would be accountable for this vision of racial equity, and that measuring his commitment to racial equity would be critical for his employment. Exhibit 4, at 4 (Module 4) ("Operationalizing a vision for racial equity means implementation of new tools for decision-making, measurement, and accountability.")

33.     Young and other employees were instructed that the training was just the very beginning of a racial equity agenda. The true goal was "transformation of government to advance racial equity." Exhibit 4, at 5 (Module 4).

34.     To follow the training, Young would also have to personally "organize to achieve racial equity." Exhibit 4, at 5 (Module 4).

35.     Young also reviewed the "Bystander intervention" process, as part of the training. That intervention process specifically called for Young to evaluate his colleagues' status in terms of being of "lower power," based on race and sex metrics. *See* Exhibit 4, at 3 (Module 4) ("Bystander Intervention: This is the act of stepping in and intervening in the moment when *a person of lower power and/or status* is interrupted, talked over, disregarded, or ignored.") (emphasis added).

36.     The Bystander intervention process also suggested to Young and his colleagues that they need not engage in any intervention if a Caucasian person was interrupted by a non-Caucasian person, given their status and power.

37.     Young and other employees were instructed that they ought to affirm other people's competence through "micro-affirmations," depending on how much "privilege" an individual had. Exhibit 4, at 4 (Module 4) ("[Micro-affirmations] serve to acknowledge those who don't enjoy the same privilege as all of their counterparts."). Given the context, the notion of "privilege" was tied to one's race.

38.     Young and other employees were instructed to let women and non-Caucasians speak first in group settings. Exhibit 4, at 4 (Module 4) ("Typically, women and people of color aren't given as much opportunity to contribute. To challenge this, invite women and members of historically marginalized groups to speak first."); *see id.* at 4 ("It's helpful to share these strategies out loud at the beginning of meetings to serve as guidelines and equip your staff to be more equitable and inclusive.").

39.    Young and other employees were instructed in the modules that reminders of these
instructions needed to be spoken out loud at the beginning of meetings.

40.    Employees, including Young and his colleagues, were worried about causal workplace
conversation, and whether certain topics might introduce dangerous risks to their
employment.

41.    Young and other employees were instructed that they might even be subjected to sub-
conscious efforts by the state and supervisors to impose the EDI training. *See* Exhibit 3, at
3 (Module 3) ("SLIDE: The state should provide training and guidance to work against an
individual's unconscious biases which are reinforced by daily messages—both subtly and
overtly—and influence how we perform our work serving the community, as well as
guidance for fostering equity, diversity, and inclusion in all state agencies.").

☰   EDI Module 3: What are EDI Strategies?

# Universal Policy: Addressing Bias

The state should provide training and guidance to
work against an individual's unconscious biases which
are reinforced by daily messages - both subtly and
overtly - and influence how we perform our work
serving the community, as well as guidance for
fostering equity, diversity, and inclusion in all state
agencies.

Responsibility and Expectation of All Employees:
Recognize that we all carry with us conscious and
unconscious bias toward others, and through
awareness, strive to remove any influence of that bias
on your work for the state and your relationships with
colleagues.

Exhibit 3, at 16 (Module 3).

42.  Young was expected to "immediately implement" these strategies "during meetings," and
to have his supervisors implement them even before such meetings began. Exhibit 4, at 5
(Module 4); *see id.* at 5 ("The key is to go over each strategy with your team, prior to
meetings, until they become a habit.").

43.  Another part of Young's mandatory EDI training was reviewing and understanding the
"Equity Continuum," which unambiguously promoted the value of state employees
treating their colleagues differently based on their race. In the bottom right corner of the
Equity Continuum, it states: "Success is often defined by treating groups/people differently
based on historic injustices and present-day barriers so everyone has the opportunity to
thrive."

44.  The implication of the Equity Continuum was that individuals within Young's
workplace—including colleagues, prisoners, and himself—would need to be treated
differently, according to race, in order to achieve success.



Exhibit 7, at STATE_000270.

45.    Even more EDI materials were presented as "Other Tools & Resources."

## Other Tools & Resources

### More EDI videos

Redlined, A Legacy of Housing Discrimination – a video that explains Redlining more in-depth
*I AM DENVER: Derek Okubo tours Amache* – a video about Japanese Internment camps in Colorado
Intersectionality 101 – a video teaching us the basics of Intersectionality
LGBT 101 – An introduction to the Queer community

### Books about Race and Marginalized Identities

- White Fragility: Why It's So Hard for White People to Talk About Racism – Robin DiAngelo
- An Indigenous Peoples' History of the United States – Roxanne Dunbar-Ortiz
- How to Be an Antiracist – Ibram X. Kendi
- The Making of Asian America – Erika Lee
- So You Want to Talk About Race – Ijeoma Oluo

*See* Exhibit 8.

46.    To be clear, while the official EDI computer module training did not require that these materials be read and absorbed in order to comply with the minimum obligations of the training, they were never labeled "optional."

47.    Young had advanced quickly through the ranks of CDOC precisely because he took seriously suggestions from his employer about tools and resources for his success.

48.    Notably, the fact that these materials were described as "other" tools and resources demonstrates that all of the materials—regardless of whether the computer module would technically be satisfied without reading them—were cast into the same category: "tools and resources" for employees to be trained on EDI.

49.    These materials, too, were part and parcel of a racially hostile work environment.

50.     In a video Young watched entitled *Redlined, A Legacy of Housing Discrimination*, for instance, one of the interviewees uses the full N-word, placing it in the voice of all individuals other than African-Americans, including Caucasians like Young.[1] ("The concept of a middle-class black only exists in the mind of a middle class black. Everywhere else in the suburbs, you were that nigger family on the corner Warren Road and Boulevard Way.") (Time stamp 3:10).



Everywhere else in the suburbs, you were that nigger family on the corner Warren Road and Boulevard Way .

---

[1] A link to the video is here: https://siliconvalleyathome.org/redlining-new-video-from-the-200/

51.     The same video describes all white individuals as having a misunderstanding regarding
their purported success. The video asserts that successful Caucasians think that their
accomplishments are based on merit, when in fact racism is responsible for their
accomplishments. *Id.* ("Well the truth is that we've had in this country generations of
affirmative action for whites, and the sad truth of it is that *whites don't know that that's
happened or they've refused to accept it*, or don't understand the history. What that leads
to is this false kind of narrative [for whites] that 'I did it myself,' you know this Horatio
Alger, individual responsibility, narrative.") (Time stamp 3:30) (emphasis added).



52.     The video echoes this theme again and again, insisting that Caucasians have a feeling of
superiority because of their racism against African-Americans, Latinos, and Native

Americans. *Id*. ("So many white Americans experience this sense of self-esteem, this sense of you know superiority if you will, this sense of mastery, that they have created their own destiny in their lives, and they have no acknowledgment of this invisible hand that supported them throughout their lives, and not just them, but there's a legacy of that invisible hand across generations, that has translated itself from the original affirmative action to trillions of dollars of 'head start' ahead of other communities like African-Americans, Latinos, Native Americans, others, who don't have the same benefit.") (Time stamp 10:37) (emphasis added).



So many white Americans experience this sense of self-esteem, this sense of you know superiority if you will, this sense of mastery, that they have created their own destiny in their lives

53.    In another training video Young watched, also under the "Other Tools & Resources" category, called Intersectionality 101, animated Claymation figures are used to describe how racial groups have different characteristics, which in turn mean that members of specific racial groups have different qualities or personality attributes.

54.    A Caucasian woman named Gretta is contrasted with two other individuals—Jerry and Fatima—as the video literally separates them by a physical divider, and states "Gretta, on the other hand, can ignore intersectionality if she wants to—another form of privilege."



*See* Exhibit 9.

55.    Young also reviewed the official website for Colorado's Office of Health Equity, which the EDI training pointed to additional links. That website contained links to materials referring to "white norms," "white talk," and further references to "white fragility."

> How do I acknowledge that I have not experienced racism or *have* benefited from privilege, power?
> It's as simple as acknowledging that your skin tone, education, role/status, etc. grants you opportunity,
> power, or privilege that others do not experience. Acknowledge that white norms in our communities and
> workplaces that can leave others feeling left out.

Exhibit 10; *see id.* at 3 ("Expect defensiveness; Consider the idea of *white fragility* and how it
might be influencing or thwarting the interaction.") (emphasis added).

56.   "White Talk" is purportedly speech used by Caucasian individuals to defend themselves
      from accusations of racism in workplace conversations about race. Exhibit 11 at 5 ("When
      a heated dialogue occurs on race, the conversation between diverse participants is typically
      on the content level, but the true dialogue is taking place on a less visible level (*White talk*
      vs. back talk). Common statements (content level) when *White talk* occurs: "My family
      didn't own slaves! I had nothing to do with the incarceration of Japanese Americans.")
      (emphasis added).

57.   Young and his colleagues were strongly discouraged by the Department of Corrections to
      stop at merely reviewing and understanding the initial materials, and to review the other
      tools and resources. *See* Exhibit 4, at 2 (Module 4) ("There is a list of Tools & Resources
      for you to continue your journey); *Id.* at 6 ("[*W*]e want you to explore innovative ideas …
      There are no simple answers or silver bullets and often times using an equity lens in *our
      work* is more about expanding our awareness about others and asking more questions to
      challenge assumptions rather than having all the answers. *There are tools and resources
      listed on this slide and the next to help you do just that*.") (emphases added).

58.   The EDI trainings imparted on Young and his colleagues the idea that they ought to be
      inspired to view more and more materials, or they would never advance to new heights or

sufficiently satisfy their employer. Exhibit 4, at 5 (Module 4) ("Has this training inspired you? Made you curious to learn more?"); *id.* ("Just like working out, one must continue to stay fit by deepening their awareness and advancing to new heights.") (referring to the other tools and resources).

59.     Young also reviewed the other tools and resources because the initial trainings seemed to be incomplete, in the sense that they lacked explanation for why Young ought to adopt its instructions.

60.     Where a tool or resource was <u>not</u> endorsed by the State of Colorado, the training mentioned as much. *See, e.g.*, Exhibit 1, at 3 (Module 1) ("After the video, there will be suggestions for other videos to watch that may or may not be related to the topic. *These are not endorsed by the State of Colorado*, though they may help you to continue your EDI learning journey.") (emphasis added); Exhibit 2, at 3 (Module 2); Exhibit 3, at 3 (Module 3) (same).

61.     Young did not review all of the optional materials. For instance, although Young did not read "How to be an Anti-racist," Young knew in broad terms that it expressly advocated racial discrimination, and that the training was impliedly advocating discrimination against Caucasians.

62.     Similarly, although Young did not read the book "White Fragility," Young knew in broad terms that the book described Caucasians as inherently defensive about accusations surrounding race.

63.     Although Young did not review "So you want to Talk About Race," the title of the book echoed the definition of race offered in the glossary: a concept created and used to justify social economic oppression of people of color by white people like Young.

64.    Young expected EDI training to recur annually.

65.    Young also expected that the modules on "EDI" would stay roughly the same, from year to year, in the sense that they would include materials that made sweeping generalizations about him, his race, and his attributes and behavior as a Caucasian person.

66.    Young expected that Defendants would continue to promote materials that described him in negative terms, as a Caucasian person.

67.    Young was aware that his colleagues were taking the EDI trainings around the time that he took it.

68.    Young suffered personal stress based on the fact that he knew his colleagues were taking the same EDI trainings, and reviewing both the modules and potentially the other tools and resources.

69.    The trainings came up in conversations among Young's colleagues at work. Young, and, upon information and belief, Young's colleagues, understood that they were obligated to take the training and adhere to it, regardless of any personal resistance.

70.    Young knew that adherence to training was strict. Employees within the Department of Corrections are expected to live up to their training. Training in the prison context was meant to be taken seriously, and applied. Training was expected to be internalized and applied every single day on the job.

71.    Many of Young's trainings were computer-based. His duty to review these trainings was absolute, and no less meaningful merely because it was taken on a computer. Supervisors repeatedly emphasized the importance of faithfully taking trainings and abiding by those various trainings. Employees were expected to consistently act on their training.

72.    Young was accustomed to following the rules and the trainings within the prison. Sometimes this involved reading prison policies; other training involved computer-based modules. Whether about the use of force, accommodating visiting prisoners' disabilities, or contraband and apparel policies for visitors, Young faithfully took trainings and applied them.

73.    The idea that Young or his colleagues could simply dismiss the training and avoid ongoing duties to apply its principles was absurd to Young. *See also* Exhibit 3, at 15-16 (Module 3) ("Further, the policies set an expectation for all employees that you recognize your bias strive to remove any influence of bias on your work for the state and your relationships with your colleagues.").

74.    Young felt isolated at the workplace, knowing that talking to colleagues or objecting to the training would potentially lead to discipline.

75.    Young was concerned that even expressing skepticism the validity of the training would cause him to be accused of racism.

76.    Young experienced significant stress surrounding whether his colleagues believed the training to be true, and were applying the training as they interacted with him. Exhibit 4, at 9 (Module 4) ("You'll be held to the expectations outlined in this policy."); *id.* at 9 ("Engage in and support respectful dialogue and courageous conversations (even when uncomfortable) about racism, privilege, dominant culture, oppression, and historical trauma.").

77.    Young's prison setting even before the trainings was already highly racially charged. On one occasion, a prisoner, an inmate with the last name "Yorks," who Young knew to be

the leader of a gang, exclaimed "So I hear you're a racist." Young was also subjected to regular insults by prisoners, including accusations related to his race.

78.    Upon information and belief, Young thought that prisoners would also be able to access the EDI training. Young thought that such exposure created inherent danger in his position, and destroyed his purpose for being employed in the prison setting in the first place.

79.    Upon information and belief, Young thought the general public, including visitors to the prison, would be able to access the EDI training.

80.    The trainings created a culture of suspicion and distrust in the Department of Corrections by creating an atmosphere where the official training materials blessed the idea that individuals of certain races had specific attributes, and that a failure to adhere to the training could result in accusations of racism, or to discipline for failing to abide by the training.

81.    Young sensed that some of his colleagues viewed him as a racist due to his status as a Caucasian individual. He also considered some of his colleagues to be especially agreeable with respect to the training, and to use the training as leverage to promote racially discriminatory beliefs in the workplace, by challenging others who made innocent comments. Exhibit 4, at 6 (Module 4) ("[U]sing an equity lens in our work is more about expanding our awareness about others and asking more questions to challenge assumptions rather than having all the answers.").

82.    Young especially felt harassment based on the idea that the training would force him to treat others differently based on their race, which was contrary to his core personal and ethical beliefs. Young felt that his continued employment would force him to become an accessory to violating his principles and the Constitution.

83. The trainings caused Young to feel like the State of Colorado was working against him, against prison safety, and against his well-being.

84. Young's knowledge that his colleagues were being instructed in the same manner with the same trainings exacerbated the hostile environment in his workplace, and made him think that he had no choice but to resign his position.

85. Young felt a personal responsibility to work with prisoners to become better people, to be civil, and to avoid considering other prisoners as enemies due to their race or skin color. The trainings fundamentally undermined Young's sense of purpose within the Department of Corrections.

86. The trainings—officially endorsed by the Department of Corrections—shook Young's belief that the prison system wanted to rehabilitate prisoners to treat their fellow prisoners as equals regardless of race.

87. Young's motivation to work in the prison system was based on his belief that the prisoners could be helped. The trainings destroyed his ability to keep going in a difficult work environment.

88. Young and other employees were instructed that they had to comply with the EDI training as a condition of their ongoing employment. *See, e.g.*, Exhibit 1, at 13 (Module 1) ("As employees of the State of Colorado, it's good to remember we are here because we've made a commitment to serve our community.").

**Internal Complaint and Resignation**

89. Young complained to his workplace, filing an internal complaint document.

90.     Rather than work with Young to resolve his concerns or find any middle ground, the Department of Corrections fully denied Young's internal complaint, dismissing the idea that the training posed any discrimination concerns.

91.     On July 6, 2021, Young was informed that his complaint would not even be investigated by the Office of the Inspector General. *See* Exhibit 12 ("Your report did not establish reasonable cause to indicate the presence of discrimination [or] discriminatory harassment.").

92.     Notably, the denial letter addressed to Young does not distinguish between computer-module based training and videos like Redlining or Intersectionality 101. It refers to all of the training as a whole, as "required."

93.     Two days later, apprised of the fact that his employer was formally refusing to address the hostile work environment, Young gave notice of his resignation from the Department of Corrections.

94.     Young timely filed a complaint with the Equal Opportunity Commission on July 13. *See* Exhibit 13.

95.     Young's last day of employment July 22, 2021.

96.     Young subsequently supplemented his complaint at the request of the EEOC on July 26, 2021. *See* Exhibit 14.

97.     On November 19, 2021, the U.S. Department of Justice, Civil Rights Division, issued a letter informing Young of his right to institute a civil action pursuant to Title VII of the Civil Rights Act of 1964. *See* Exhibit 15 (Right to Sue Letter).

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**(Against Defendant Colorado Department of Corrections)**

(Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-2(a)(1))
(Employment Discrimination – Hostile Work Environment)

98.  Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

99.  Title VII precludes employers from engaging in race discrimination, including by holding employers liable for a hostile work environment based on race.

100.  During the relevant period, Young was employed by the Defendant, the Colorado Department of Corrections.

101.  Young is a member of one of the classes protected by Title VII because he is a Caucasian individual.

102.  No employer would dare include in their official corporate training materials the same insulting and humiliating statements about other races besides Caucasians.

103.  The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created severe racial discrimination against Young, based on his race.

104.  The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created pervasive racial discrimination against Young, based on his race.

105.  When Young complained of the use of racially discriminatory training materials, Defendant dismissed his concerns and his complaint.

106.   Defendants knew of the harassing nature of the training materials—Defendant created and implemented the materials, and Young directly objected to their use—yet did nothing to cure the issue.

107.   Based on the facts detailed above, Young's workplace was permeated with discrimination, intimidation, ridicule, and insult.

108.   The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created an abused working environment, based on race.

109.   The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—altered the terms, conditions, and privileges of Young's employment.

110.   At all times, the racially discriminatory conduct engaged in by Young's employer was unwelcome.

111.   The racially discriminatory conduct engaged in by Young's employer unreasonably interfered with his work performance.

112.   The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—caused Young to perceive the workplace as abusive and hostile, and it was abusive and hostile objectively.

113.   Any reasonable person in Young's place would experience a hostile work environment based on race.

114.   Young felt harassed and intimidated to the point that he no longer felt comfortable working for the Department of Corrections, and ultimately resigned.

115.   Young alleges and establishes that the workplace was abusive and hostile based on direct
       evidence, as opposed to indirect evidence.

116.   Based on all of the circumstances, Young suffered a hostile work environment.

117.   Young seeks relief in the form of reinstatement, along with other relief specified below.

**SECOND CLAIM FOR RELIEF**
**(Against Defendant Colorado Department of Corrections)**

(42 U.S.C. § 1981)
(Employment Discrimination – Hostile Work Environment)

118.   Plaintiff realleges and incorporates by reference the allegations set forth above as if fully
       set forth herein.

119.   Section 1981 protects employees from private race discrimination in the employment
       context. ("All persons within the jurisdiction of the United States shall have the same right
       in every State and Territory to make and enforce contracts, to sue, be parties, give evidence,
       and to the full and equal benefit of all laws and proceedings for the security of persons and
       property as is enjoyed by white citizens.").

120.   "The same substantive standards apply to a hostile work environment claim regardless of
       whether the plaintiff has brought it under § 1981 or Title VII." *Lounds v. Lincare, Inc.*,
       812 F.3d 1208, 1221 (10th Cir. 2015).

121.   Young is a member of one of the classes protected by Section 1981 because he is a
       Caucasian individual.

122.   No employer would dare include in their official corporate training materials the same
       insulting and humiliating statements about other races besides Caucasians.

123. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created severe racial discrimination against Young, based on his race.

124. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created pervasive racial discrimination against Young, based on his race.

125. Based on the facts detailed above, Young's workplace was permeated with discrimination, intimidation, ridicule, and insult.

126. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created an abused working environment, based on race.

127. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—altered the terms, conditions, and privileges of Young's employment.

128. When Young complained of the use of racially discriminatory training materials, Defendant dismissed his concerns and his complaint.

129. Defendants knew of the harassing nature of the training materials—Defendant created and implemented the materials, and Young directly objected to their use—yet did nothing to cure the issue.

130. At all times, the racially discriminatory conduct engaged in by Young's employer was unwelcome.

131.  The racially discriminatory conduct engaged in by Young's employer unreasonably interfered with his work performance.

132.  The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—caused Young to perceive the workplace as abusive and hostile, and it was abusive and hostile objectively.

133.  Any reasonable person in Young's place would experience a hostile work environment based on race

134.  Young felt harassed and intimidated to the point that he no longer felt comfortable working for the Department of Corrections, and ultimately resigned.

135.  Based on all of the circumstances, Young suffered a hostile work environment.

136.  Young seeks relief in the form of reinstatement, along with other relief specified below.

### THIRD CLAIM FOR RELIEF
### (Against Defendant Colorado Department of Corrections)

(Employment Discrimination -- Constructive Discharge)

137.  Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

138.  The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—were illegal.

139.  The training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—were racially discriminatory.

140.  The racially discriminatory training materials promulgated by Defendants and imposed on the workplace made Young's working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.

141.    The conditions of Young's employment were objectively intolerable.

142.    The racially discriminatory training materials promulgated by Defendants and imposed on the workplace made Young's job so unattractive and unpleasant as to constructively terminate him from his employment.

143.    Based on the facts detailed about, Young's workplace was permeated with discrimination, intimidation, ridicule, and insulting causing Young to resign.

144.    The racially discriminatory training materials promulgated by Defendants and imposed on the workplace —along with CDOC's refusal to address Young's complaint—created an abused working environment, based on race.

145.    Young felt that his continued employment would force him to become an accessory to violating his principles and the Constitution. *Cf. Johnson v. California*, 543 U.S. 499 (2005) (applying a heightened standard of review to racial classifications, even in prisons).

146.    Young in fact resigned.

147.    Under the circumstances, Young had no choice but to resign.

148.    Young seeks reinstatement, but only to the extent that Defendants' EDI training materials no longer violate Title VII, Section 1981, or the Equal Protection Clause.

**FOURTH CLAIM FOR RELIEF**
**(Against Defendants Dean Williams and Jill Hunsaker Ryan)**

(Fourteenth Amendment Right to Equal Protection)
(42 U.S.C. § 1983)

149.    Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

150. The Fourteenth Amendment to the U.S. Constitution generally prevents states from engaging in invidious racial classifications.

151. The Fourteenth Amendment to the U.S. Constitution generally prevents states from using racial stereotypes in policy-making.

152. The Fourteenth Amendment to the U.S. Constitution generally protects Plaintiff from discrimination on the basis of his race and color.

153. While employed at the Department of Corrections, Plaintiff was similarly situated in all relevant aspects to all other corrections officers regardless of race and color.

154. The development and use of the training materials described above was racially discriminatory, and motivated by invidious racial stereotypes.

155. The materials themselves contain invidious racial stereotypes and racial classifications.

156. The materials classify individuals by race, treat individuals differently based on race, and instruct employees to treat each other differently based on race. The materials also demean and stigmatize Plaintiff, along with all other similarly situated individuals, based on race and skin color.

157. To extent that the same or similar materials are used by Defendants, and to the extent that Young is reinstated, the materials will continue to injure him.

158. The training materials used race as a stereotype and a negative, in violation of the Equal Protection Clause. *Cf. Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, No. 20-1199, No. 21-707, 2023 WL 4239254, *14 (Jun. 29, 2023) ("University programs must comply with strict scrutiny, they may never use race as a stereotype or negative, and—at some point—they must end.").

159.    Defendants' discrimination against Plaintiff on the basis of his race and color is subject to strict scrutiny.

160.    Use of the training materials does not satisfy strict scrutiny.

161.    Use of the training materials does not further a compelling governmental interest of Colorado or the Colorado Department of Corrections, or the Colorado Department of Public Health and Environment.

162.    Use of the training materials is not narrowly tailored to further a compelling government interest of Colorado or the Colorado Department of Corrections.

163.    Defendants have no legitimate governmental interest in furthering racial discrimination. This is particularly relevant in the prison context, where racial animus is already high, and promoting further tension between races is likely to exacerbate, rather than ameliorate, the problem.

164.    Defendants have no legitimate governmental interest in conveying to non-white individuals that they are inherently oppressed or inherently victims of discrimination.

165.    To the extent that legitimate state interests are at issue, the government can achieve those interests in a way that does not divide and discriminate against Plaintiff and other Caucasian corrections officers on the basis of race.

166.    All actions taken by Defendants were taken while acting under the color of state law, statute, regulation, or custom of Colorado and had the effect of depriving Plaintiff of rights secured by the U.S. Constitution, specifically the Equal Protection Clause of the Fourteenth Amendment.

167.    All actions taken by Defendants were taken pursuant to official policies, practices, and customs.

168.    As a result of Defendants' actions, Plaintiff has suffered irreparable harm to his constitutional rights and his rights under State and Federal laws.

169.    Plaintiff has no adequate legal, administrative, or other remedy at law by which to prevent or minimize this harm.

170.    Absent injunctive and declaratory relief enjoining Defendants and their agents, officials, servants, employees, and attorneys from promulgating and disseminating racially discriminatory training materials, Plaintiff has suffered and will continue to suffer great and irreparable harm.

171.    Defendants have acted and are continuing to act "under color of state law" for purposes of federal civil rights law. 42 U.S.C. § 1983.

172.    Pursuant to 42 U.S.C. §§ 1983, Plaintiff is entitled to declaratory and injunctive relief.

173.    Plaintiff is entitled to a final judgment under 28 U.S.C. §§ 2201 and 2202 and the Fourteenth Amendment of the U.S. Constitution declaring that Defendants violated Plaintiff's rights under the Fourteenth Amendment of the U.S. Constitution.

## <u>RELIEF REQUESTED</u>

Plaintiff respectfully requests that this Court:

A.    Find liability against Defendant Colorado Department of Corrections for a violation of Title VII, 42 U.S.C. § 2000e-2(a)(1).

B.    Find liability against Defendant Colorado Department of Corrections for a violation of 42 U.S.C. § 1981.

C.      Enter a declaratory judgment that Defendants violated 42 U.S.C. § 2000e-2(a)(1) by directly creating, and failing to cure, a racially discriminatory hostile work environment;

D.      Enter a declaratory judgment that the Department of Correction's use of racially discriminatory training materials violates Title VII of the Civil Rights Act of 1964;

E.      Enter a declaratory judgment that Defendants Williams and Hunsaker Ryan's development, dissemination, and promulgation of racially discriminatory training materials violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

F.      Enter an order permanently enjoining Defendants from continuing to utilize racially discriminatory materials in its mandatory trainings;

G.      Reinstate Plaintiff at the Limon Correctional Facility, as part of the relief for all counts, including liability under 42 U.S.C. § 1981 and 42 U.S.C. § 1983;

H.      Award Plaintiff backpay, front pay, and emotional distress damages;

I.      Award Plaintiff such costs and attorney fees as allowed by law, including under 42 U.S.C. § 1988; and

J.      Grant Plaintiff such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues and claims so triable.

DATED this 30th day of June, 2023.        Respectfully submitted,

_/s/ William E. Trachman_
William E. Trachman, CO Bar #45684
David C. McDonald, CO Bar #53709
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
Facsimile: (303) 292-1980
wtrachman@mslegal.org
dmcdonald@mslegal.org

_Attorneys for Plaintiff Joshua F. Young_