**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| JOSHUA F. YOUNG,<br><br>Plaintiff,<br><br>v.<br><br>COLORADO DEPARTMENT OF CORRECTIONS; MOSES "ANDRE" STANCIL; and JILL HUNSAKER RYAN,<br><br>Defendants. | No. 23-cv-1688<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff hereby files this First Amended Complaint under Fed. R. Civ. P. 15(a), the parties' Joint Motion to Amend Order Setting Initial Case Deadlines, ECF 31, and the Court's order granting that motion. ECF 33. A redline is attached as Exhibit 1.

Joshua Young was a rising star at the Colorado Department of Corrections. After starting as a Corrections Officer at Limon Correctional Facility in 2017, he quickly rose to the position of Housing Sergeant in 2019. In that position, Young ran a close-custody unit in one of the most challenging prisons in Colorado. In 2020, he took the position of Visiting Sergeant, where his job was to ensure the safety of both prisoners and visitors during visitation periods. His job and his safety, along with the safety of colleagues, prisoners, and guests, depended on making smart decisions and treating people equally, regardless of their race or skin color.

Unfortunately, the Colorado Department of Corrections had different ideas. It announced that Young and his colleagues had to review official training, referred to as "Equity, Diversity, and Inclusion" training. The training insisted, among other things, that all Caucasians are racist, that they perpetuate white supremacy, that the very notion of race was invented by white people to justify the oppression of people of color, that white supremacy is an ever-present feature of daily

life in the United States, and that Caucasians who deny their own racism are merely "fragile" racists who cannot accept their own prejudice. Indeed, the Colorado prison system's forced training wanted its employees to believe and internalize these messages, to the detriment of prison safety, and to create a culture of distrust among its hard-working officers. *See* Exhibits 2-5 (Transcripts of Modules 1, 2, 3, and 4).

The result was that Young suffered discrimination in his employment, under Title VII and 42 U.S.C. § 1981, and was constructively discharged.

**<u>Statement of Related Case</u>**

Plaintiff initially brought suit in January 2022. *See Young v. Colorado Department of Corrections*, 22-cv-00145-NYW-KLM (D. Colo., Jan. 19, 2022). In that case, Young alleged hostile work environment discrimination under Title VII, and sought injunctive relief under 42 U.S.C. § 1983. That case was dismissed by Judge Nina Wang, without prejudice. *See* Order on Motion to Dismiss in *Young v. Colorado Dep't. of Corrections*, at 26 (Feb. 3, 2023) (Exhibit 6) ("Plaintiff's hostile work environment claim is **DISMISSED without prejudice** for failure to state a claim); *see id.* ("Plaintiff's equal protection claim is **DISMISSED without prejudice** for lack of subject matter jurisdiction.") (bold in original).

However, despite dismissing without prejudice, Judge Wang did not grant leave to amend, and immediately entered judgment, and directed the Clerk of Court to terminate the case. *Id.* at 26 ("The Clerk of the Court is **DIRECTED to TERMINATE** the case.") (bold in original).

Young then appealed that ruling to the Tenth Circuit Court of Appeals on March 1, 2023. On March 11, 2024, the Tenth Circuit affirmed the District Court's dismissal. *See Young v. Colorado Department of Corr.*, No. 23-1063 (10th Cir. Mar. 11, 2024) (Exhibit 7) (Young Op.).

The Tenth Circuit held that "diversity" training materials may trigger hostile environment liability under Title VII. *Id.* at 2. ("To the extent diversity programs generate such animus, they are equally subject to the prohibitions of Title VII and the Fourteenth Amendment."); *id.* at 3 ("The rhetoric of these programs sets the stage for actionable misconduct by organizations that employ them.").

But while the EDI training materials before the Tenth Circuit—all of which <u>and more</u> are described in this complaint—contained "troubling" racial rhetoric, that Court held that Young had not yet pled facts to show the training created a workplace "permeated with discriminatory intimidation, ridicule, and insult[.]" Young Op., Exhibit 7, at 3 ("Although he alleges the explicitly race-based implications of the training could eventually compromise employment opportunities, workplace cohesion, and prison security, those allegations are too speculative at this time to meet what our case law requires."); *id.* at 11-13.

In this amended complaint, Young fixes these issues, and includes voluminous factual allegations that address the areas identified by the Tenth Circuit. These allegations demonstrate the ongoing and pervasive nature of the hostile environment created by the EDI training, the compulsory nature of the training enforced by Young's supervisors, and specific instances of discriminatory treatment Young experienced from his co-workers. To be clear, none of the allegations in this Complaint are inconsistent with Young's prior allegations, and Young is prepared to testify under oath regarding each allegation. And Young's claims, having been dismissed without prejudice, but refiled in June 2023, remain within the statute of limitations.

## <u>PARTIES</u>

1. Plaintiff Joshua F. Young resides in Colorado Springs, in the District of Colorado.

2. Defendant Colorado Department of Corrections is the principal department of the Colorado state government that operates the state prisons.

3. Defendant Moses "Andre" Stancil is the Executive Director of the Colorado Department of Corrections. He is sued in his official capacity.

4. Defendant Jill Hunsaker Ryan is the Executive Director of the Colorado Department of Public Health & Environment, which created and/or promulgated some or all of the training materials used by the Colorado Department of Corrections. She is sued in her official capacity.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this complaint under 28 U.S.C. §§ 1331 and 1343 because this case presents a substantial question of federal law, specifically whether Defendants' discriminatory training materials created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq. and 42 U.S.C. § 1981.

6. Venue is appropriate in this district under 28 U.S.C. § 1391. A substantial part of the events giving rise to this claim occurred in this district, and Defendants maintain one or more offices and employees in this district.

## Facts

7. In February 2021, the Colorado Department of Corrections announced that all CDOC employees were required to take an Equity, Diversity, and Inclusion (EDI) training.

8. Young took the annual training in March 2021, soon after it was assigned. Like all other assigned training, the material from the EDI training was expected to be used every day at work.

9. The EDI training contained several computer modules, with employees like Young working through materials like those described below.

10. First, Young's EDI training began with a review of "a glossary of terms assembled by CDPHE's Health Equity Office." *See* Exhibit 8.

11. The glossary displayed the official markings of the State of Colorado and CDPHE, along with the Office of Health Equity:




Exhibit 8, at STATE_000245.

12. The glossary was meant not just to be read as part of the mandatory EDI training, but to be implemented, by providing a "common language" for Young, his colleagues, and any others taking the EDI training:

In an effort to provide common language, the Office of Health Equity has compiled a list of terms relevant to the work and movement to advance equity. Take note that evolving language is a positive sign in social justice movements. To that end, this list will be modified on an ongoing basis.

If a term exists that you'd like to further explore or you don't quite agree with, we encourage you to browse the internet for additional articles, blogs, etc. on the topic. Just as language evolves over time, our opinions and beliefs may also evolve.

---

**Ableism:** The discrimination of and social prejudice against people with disabilities based on the belief that typical abilities are superior. It is rooted in the assumption that disabled people require "fixing" and defines people by their disability. Like racism and sexism, ableism classifies entire groups of people as "less than," and includes harmful stereotypes, misconceptions, and generalizations of people with disabilities.
*Adapted from Access Living

**Ally:** Someone from a dominant group (who experiences unearned access and/or power) who acts in support of non-dominant group members. Allies practice genuine **allyship**. That is, they take action, reflect on their own thinking and beliefs, seek out learning opportunities, take initiative in interpersonal relations, and work to create systems of equity.

**Anti-Racism:** Some form of focused and sustained action, which includes inter-cultural, inter-faith, multi-lingual and inter-abled (i.e., differently abled) communities with the intent to change a system or an institutional policy, practice, or procedure which has racist effects.
*Adapted from the Anti-Racism Digital Library

**BIPOC**: Acronym for Black, Indigenous People, and People of Color; the term is used to acknowledge that Indigenous and Black people have been most impacted by whiteness, both historically and in the present day. This

STATE_000246

Exhibit 8, at STATE_000246.

13. The terms defined in the glossary were explicitly meant to be used and adopted by CDOC employees—beyond merely for the purposes of taking the EDI training—to further the goals of advancing "equity." *Id.* ("Take note that evolving language is a positive sign in social justice movements.").

14. If employees disagreed with the contents of the glossary, it was obvious that eventual conformity was nevertheless necessary: “Just as language evolves over time, our opinions and beliefs may also evolve.” *Id.*

15. Employees were expected to apply the lessons of the training to their day-to-day work. Exhibit 9 (“How do I include EDI in my work? In this module you will explore ways to challenge and disrupt bias within your team, become familiar with EDI-specific expectations for all employees, and familiarize yourself with the resources available (both internal and external) to help support EDI policy and foster a safe, equitable workplace for all.”).

16. The glossary provided Young the meaning of certain EDI terms in grossly offensive language, targeted at Caucasian employees specifically. For instance, the definition of “BIPOC” adopted the term “whiteness” to describe how “Indigenous and Black people have been impacted most by whiteness,” and how whiteness has shaped “the experiences of and relationship to white supremacy for all people of color within a U.S. context.”


**BIPOC**: Acronym for Black, Indigenous People, and People of Color; the term is used to acknowledge that Indigenous and Black people have been most impacted by whiteness, both historically and in the present day. This

STATE_000246

shapes the experiences of and relationship to white supremacy for all people of color within a U.S. context.
*Adapted from The BIPOC Project

Exhibit 8, at STATE_000246–47.

17. Defendants' state-sanctioned training therefore implied a direct relationship between "whiteness" and "white supremacy," which it contends presently affects "all people of color in the United States."

18. Similarly, the official definition of "race" for the EDI trainings similarly blamed "white people" like Young for creating the very idea of race "to justify social economic oppression of people of color by white people."




Exhibit 8, at STATE_000254.

19. In other words, every time the EDI modules or other training materials referred to race, racial discrimination, or racial diversity, takers of the training were meant to recall this initial part of the mandatory training and use the glossary's definition of "race" as their "common language." Exhibit 8, at STATE_000254 ("[T]he following definitions are to be used as background information for the training.").

20. The glossary also defined a term called "White Exceptionalism," which apprised Young of the fact that he perpetuated white supremacy solely due to his Caucasian race, regardless of his individual actions. Indeed, because Young has never actually been a white supremacist, the

training apprised him that it had concluded that as a white person, Young is "more interested in not seeming racist than actually improving the lives of people of color." Unless he acknowledged his part in perpetuating white supremacy, Young could never sufficiently support equity, only "fakequity."

> **White Exceptionalism:** The belief held by some white allies that they are the exception to white racism even though they fail to address the implicit ways in which they perpetuate white supremacy. These individuals are often more interested in not seeming racist than actually improving the lives of people of color. This is sometimes referred to as **fakequity** (*Erin Okono*).
> *Adapted from *Me and White Supremacy: Combat Racism, Change the World, and Become a Good Ancestor* by Layla Saad

Exhibit 8, at STATE_000258.

21. The EDI training also announced that when a white person like Young is confronted "by information about racial inequality and injustice," he or she will invariably experience "[d]iscomfort and defensiveness, often triggered by fear or guilt."

> **White Fragility**: Discomfort and defensiveness, often triggered by feelings of fear or guilt, on the part of a white person when confronted by information about racial inequality and injustice.

*Id.*

22. The glossary also defined the phrase "White Supremacy." But far from describing radicals like Neo-Nazis, skinheads, or members of the Ku Klux Klan, the glossary pronounced broadly that White Supremacy is "institutionally perpetrated" by Caucasian people. Exhibit 8, at STATE_000258 (White Supremacy is an "*institutionally perpetrated* system of exploitation and oppression of nations and people of color by *white peoples of European descent* for the purpose of establishing, maintaining, and defending a system of wealth, power, and privilege.").




*Id.* (emphasis added).

23. For good measure, the training explained why the word "Black" is capitalized in the EDI training, and ought to be capitalized generally, "to convey a shared sense of history and identity among people in the African diaspora and within Africa." It further explained why the EDI training, as well as state employees, did not and should not capitalize the word "white." The racial groups had to be treated differently, said the EDI training, so as to avoid a "symbolic nod to white supremacy."

**A note on capitalizing "Black"**

When referring to a person or community, "Black" is capitalized to convey a shared sense of history and identity among people in the African diaspora and within Africa. This puts the term on equal racial, ethnic, and cultural footing as terms like Latinx, Asian American, American Indians & Alaska Natives, etc.

While some publications have also chosen to capitalize "white", many others have taken a stance against this on the principle of equity. Capitalizing "white" could be seen as a symbolic nod to white supremacy, and it's important to note that the majority of white Americans do not see themselves as a collective ethnic group the same way that Black Americans do.

Front cover images credit (clockwise from top left): @dukdukpaint via Picuki, Perry Grone/Getty Images, shaunl/Getty Images, Oleksii Liskonih/Getty Images, HowLettery/Getty Images, Clay Banks/Getty Images, Mapping Inequality

COLORADO
Office of Health Equity
Department of Public Health & Environment

STATE_000259

Exhibit 8, at STATE_000259.

24. The word "race" or one of its variants—defined by the glossary as invented by Caucasians to oppress non-Caucasians—was used innumerable times, throughout the EDI training. *See, e.g.*, Exhibit 2, at 5 (Module 1) ("Social factors that impact quality of life are: Identity, often racial or ethnic background."); *id.* at 7 ("Property values were determined by race."); *id.* at 12 ("[R]acial

and income inequality actually hinders economic prosperity…"); Exhibit 4, at 3 (Module 3) ("The most well-documented inequities throughout history are based on race, and so these are the ones that we are able to highlight most often."); *see also* Exhibit 5, at 4 (Module 4) ("Racial Equity Tool"). This is a small sub-sample of the times where the modules referred to "race."

25. Indeed, based on the four modules that followed, Young and other employees were instructed to have *more* conversations about race in the workplace. *See, e.g.*, Exhibit 5, at 4 (Module 4) ("One theory of change requires normalizing conversations about race."); *id.* at 6 ("The intention of this course is to bring awareness to EDI and how it can be applied to the work that you do as a state employee.").

26. Each of these conversations were supposed to apply the EDI training's definition of race; which, of course had been offered by the "common language" in the glossary. Exhibit 5, at 4 (Module 4) ("One theory of change requires normalizing conversations about race, making sure we have a shared understanding of commonly held definitions of implicit bias and institutional and structural racism.").

27. The modules instructed Young and his colleagues that even the most routine of decisions, they needed to take account of race. Exhibit 5, at 4 (Module 4) ("We must also operationalize racial equity, integrating racial equity into our routine decision-making processes and development and implementation of measurable actions."); Exhibit 5, at 6 (Module 4) ("We know we presented a lot of information in this program, but you should know that you are not alone in the journey to understand inequities and to make a difference <u>through your role in state government</u>.") (emphasis added).

28. The trainings also directed further insults at Caucasians. For instance, in Module 3, the trainings defined cultural appropriation, noting that its occurrence is based on "white" dominance. Exhibit 4, at 15 (Module 3)

> Be aware of arts that appropriate culture and do not accurately portray the people from that culture. Cultural appropriation is defined as: the theft of cultural elements for one's own use, commodification, or profit—including symbols, art, language, customs, etc.—often without understanding, acknowledgment, or respect for its value in the original culture. *Results from the assumption that a dominant (i.e. white) culture's right to take other cultural elements.*

(emphasis added).

29. The language of "dominance" is reflected in other portions of the training, including one portion about "Ideological Oppression." *See, e.g.*, Exhibit 3, at 14 (Module 2) ("Ideological oppression starts when the *dominant group* associates positive qualities with itself and negative qualities with the marginalized or the othered group.") (emphasis added).

30. The implication from describing Caucasians as the dominant group is that Caucasians like Young, alone, are responsible for ideological oppression of "marginalized" and "othered" groups.

31. Young and his colleagues were instructed that his conformity with EDI would be "measured," and that he would be held "accountable" for this vision of racial equity. Exhibit 5, at 4 (Module 4) ("Operationalizing a vision for racial equity means implementation of new tools for decision-making, measurement, and accountability.")

32. Young and other employees were instructed that the training was just the very beginning of a racial equity agenda. The true goal was full "transformation of government to advance racial equity." Exhibit 5, at 5 (Module 4).

33. To follow the training, Young would also have to personally "organize to achieve racial equity." Exhibit 5, at 5 (Module 4).

34. Young also reviewed the "Bystander Intervention" process, as part of the training. That intervention process specifically called for Young to evaluate his colleagues' status in terms of being of "lower power," based on race and sex metrics. *See* Exhibit 5, at 3 (Module 4) ("Bystander Intervention: This is the act of stepping in and intervening in the moment when *a person of lower power and/or status* is interrupted, talked over, disregarded, or ignored.") (emphasis added).

35. The Bystander Intervention process also suggested to Young and his colleagues that they need not engage in any intervention if a Caucasian person was interrupted by a non-Caucasian person, given their status and power.

36. Young and his colleagues were instructed that they ought to affirm other people's competence through "micro-affirmations," depending on how much "privilege" an individual had. Exhibit 5, at 4 (Module 4) ("[Micro-affirmations] serve to acknowledge those who don't enjoy the same privilege as all of their counterparts."). Given the context, the notion of "privilege" was tied to one's race.

37. Young and other employees were instructed to let women and non-Caucasians speak first in group settings. Exhibit 5, at 4 (Module 4) ("Typically, women and people of color aren't given as much opportunity to contribute. To challenge this, invite women and members of historically marginalized groups to speak first."); *see id.* at 4 ("It's helpful to share these strategies out loud at the beginning of meetings to serve as guidelines and equip your staff to be more equitable and inclusive.").

38. Young and other employees were instructed in the modules that reminders of these instructions needed to be spoken out loud at the beginning of meetings.

39. Employees, including Young and his colleagues, were worried about casual workplace conversation, and whether certain topics might introduce dangerous risks to their employment.

40. Young and other employees were instructed that they might even be subjected to training and guidance that would affect their sub-conscious thoughts. *See* Exhibit 4, at 3 (Module 3) ("SLIDE: The state should provide training and guidance to work against an individual's unconscious biases which are reinforced by daily messages—both subtly and overtly—and influence how we perform our work serving the community, as well as guidance for fostering equity, diversity, and inclusion in all state agencies.").




Exhibit 4, at 16 (Module 3).

41. Young was expected to "immediately implement" these strategies "during meetings," and to have his supervisors implement them even before such meetings began. Exhibit 4, at 5 (Module

4); *see id.* at 5 ("The key is to go over each strategy with your team, prior to meetings, until they become a habit.").

42. Another part of Young's mandatory EDI training was reviewing and understanding the "Equity Continuum," which unambiguously promoted the value of state employees treating their colleagues differently based on their race. In the bottom right corner of the Equity Continuum, it states: "Success is often defined by treating groups/people differently based on historic injustices and present-day barriers so everyone has the opportunity to thrive."

43. The implication of the Equity Continuum was that individuals within Young's workplace—including colleagues, prisoners, and himself—would need to be treated differently, according to race, in order to achieve success.




| | Diversity | Inclusion | Equality | Equity |
|---|---|---|---|---|
| | *"A description of your differences"* | *"What you DO with your diversity"* | *"Giving everyone the same access"* | *"Leveling the playing field"* |
| *What it looks like in practice* | - Not always strategic; it can happen accidentally<br>- Does not describe how people function or work<br>- It is possible to be "diverse" and not "include" people or communities | - Requires intentional action to make everyone feel welcomed and valued: inclusion is not a natural consequence of diversity<br>- Goes beyond simply "becoming diverse" by truly leveraging abilities, unique qualities and perspectives of individuals<br>- Focuses on the real experiences of individuals and communities | - Achieved by making sure that everyone is supported by providing the same resources or treatment<br>- Ensures everyone is recognized and respected | - Recognizes that there are both advantages and barriers to accessing resources, and as a result we don't all start from the same place<br>- Tailoring platforms for success and working to correct and address systemic barriers |
| *How success is defined* | - Success (and failure) is often defined by simple statistical performance (i.e. we hired x% of women; we have x% Black participants, y% Latinx participants, and z% white participants). | - Success is defined through retention, trust and engagement of employees/community/individuals | - Success is often defined by assuring that all groups/people have the same. | - Success is often defined by treating groups/people differently based on historic injustices and present-day barriers so everyone has the opportunity to thrive. |

Exhibit 10, at STATE_000270.

44. Even more EDI materials were presented as "Other Tools & Resources."




Exhibit 11.

45. Young and his colleagues were strongly discouraged by the Department of Corrections to stop at merely reviewing and understanding the initial materials, and emphatically encouraged to review the other tools and resources. *See* Exhibit 5, at 2 (Module 4) ("There is a list of Tools & Resources for you to continue your journey); *Id.* at 6 ("[*W]e want you to explore innovative ideas* … There are no simple answers or silver bullets and often times using an equity lens in *our work* is more about expanding our awareness about others and asking more questions to challenge assumptions rather than having all the answers. *There are tools and resources listed on this slide and the next to help you do just that*.") (emphases added).

46. The EDI trainings imparted on Young and his colleagues the idea that they ought to be inspired to view more and more materials, or they would never advance to new heights or

sufficiently satisfy their employer. Exhibit 5, at 5 (Module 4) ("Has this training inspired you? Made you curious to learn more?"); *id.* ("Just like working out, one must continue to stay fit by deepening their awareness and advancing to new heights.") (referring to the other tools and resources) (emphasis added).

47. Young also reviewed the other tools and resources because the initial trainings seemed to be incomplete, in the sense that they lacked explanation for why Young ought to adopt its instructions.

48. Where a tool or resource was not endorsed by the State of Colorado, the training mentioned as much. *Compare, e.g.*, Exhibit 2, at 3 (Module 1) ("After the video, there will be suggestions for other videos to watch that may or may not be related to the topic. *These are not endorsed by the State of Colorado*, though they may help you to continue your EDI learning journey.") (emphasis added); Exhibit 3, at 3 (Module 2); Exhibit 4, at 3 (Module 3) (same).

49. To be clear, while the official EDI computer module training did not require that these materials be read and absorbed in order to comply with the minimum obligations of the training, they were never labeled "optional."

50. Young had advanced quickly through the ranks of CDOC precisely because he took seriously suggestions from his employer about tools and resources for his success.

51. Notably, the fact that these materials were described as "other" tools and resources demonstrates that all of the materials—regardless of whether the computer module would technically be satisfied without reading them—were cast into the same category: "tools and resources" for employees to be trained on EDI.

52. These training materials were racially discriminatory and motivated by invidious racial stereotypes. The materials classified individuals by race, treated individuals differently based on race, and instructed employees to treat each other differently based on race. The materials also demeaned and stigmatized Young and similarly situated individuals based on race and skin color. The use of racial stereotypes and negative characterizations in the training materials contributed to a severe and pervasive hostile work environment.

53. These materials, too, were part and parcel of a racially hostile work environment.

54. In a video Young watched entitled *Redlined, A Legacy of Housing Discrimination*, for instance, one of the interviewees uses the full N-word, placing it in the voice of all individuals other than African-Americans, including Caucasians like Young.[1] ("The concept of a middle-class black only exists in the mind of a middle class black. Everywhere else in the suburbs, you were that nigger family on the corner Warren Road and Boulevard Way.") (Time stamp 3:10).

[1] A link to the video is here: https://siliconvalleyathome.org/redlining-new-video-from-the-200/




55. The same video describes all white individuals as having a misunderstanding regarding their purported success. The video asserts that successful Caucasians think that their accomplishments are based on merit, when in fact racism is responsible for their accomplishments. *Id.* ("Well the truth is that we've had in this country generations of affirmative action for whites, and the sad truth of it is that *whites don't know that that's happened or they've refused to accept it*, or don't understand the history. What that leads to is this false kind of narrative [for whites] that 'I did it myself,' you know this Horatio Alger, individual responsibility, narrative.") (Time stamp 3:30) (emphasis added).




56. The video echoes this theme again and again, insisting that Caucasians have a feeling of superiority because of their racism against African-Americans, Latinos, and Native Americans. *Id*. ("So many white Americans experience this sense of self-esteem, this sense of you know superiority if you will, this sense of mastery, that they have created their own destiny in their lives, and they have no acknowledgment of this invisible hand that supported them throughout their lives, and not just them, but there's a legacy of that invisible hand across generations, that has translated itself from the original affirmative action to trillions of dollars of 'head start' ahead of other communities like African-Americans, Latinos, Native Americans, others, who don't have the same benefit.") (Time stamp 10:37) (emphasis added).




57. In another training video Young watched, also under the "Other Tools & Resources" category, called Intersectionality 101, animated Claymation figures are used to describe how racial groups have different characteristics, which in turn mean that members of specific racial groups have different qualities or personality attributes.

58. A Caucasian woman named Gretta is contrasted with two other individuals—Jerry and Fatima—as the video literally separates them by a physical divider, and states "Gretta, on the other hand, can ignore intersectionality if she wants to—another form of privilege."




*See* Exhibit 12.

59. Young also reviewed the official website for Colorado's Office of Health Equity, which the EDI training pointed to for additional links. That website contained links to materials referring to "white norms," "white talk," and further references to "white fragility."

> How do I acknowledge that I have not experienced racism or *have* benefited from privilege, power? It's as simple as acknowledging that your skin tone, education, role/status, etc. grants you opportunity, power, or privilege that others do not experience. Acknowledge that white norms in our communities and workplaces that can leave others feeling left out.

Exhibit 13; *see id.* at 3 ("Expect defensiveness; Consider the idea of *white fragility* and how it might be influencing or thwarting the interaction.") (emphasis added).

60. "White Talk" is purportedly speech used by Caucasian individuals to defend themselves from accusations of racism in workplace conversations about race. Exhibit 14 at 5 ("When a heated dialogue occurs on race, the conversation between diverse participants is typically on the content level, but the true dialogue is taking place on a less visible level (*White talk* vs. back talk). Common

statements (content level) when *White talk* occurs: "My family didn't own slaves! I had nothing to do with the incarceration of Japanese Americans.") (emphasis added).

61. Young did not review all of the "other tools and resources" materials. For instance, although Young did not read "How to be an Anti-racist," Young knew in broad terms that it expressly advocated racial discrimination, and that the training was impliedly advocating discrimination against Caucasians.

62. Similarly, although Young did not read the book "White Fragility," Young knew in broad terms that the book described Caucasians as inherently defensive about accusations surrounding race.

63. Although Young did not review "So you want to Talk About Race," the title of the book echoed the definition of race offered in the glossary: a concept created and used to justify social economic oppression of people of color by white people like Young.

64. These materials demeaned and stigmatized Plaintiff, along with all other similarly situated individuals, based on race and skin color.

65. Young expected and knew that EDI training would recur annually, as with their other training. Further, Young expected that Defendants would continue to promote materials that described him in negative terms, as a Caucasian person. To the extent that the same or similar materials are used by Defendants, and to the extent that Young is reinstated, the materials will continue to injure him and contribute to an ongoing hostile work environment.

66. Young also expected that the modules on "EDI" would stay roughly the same, from year to year, in the sense that they would include materials that made sweeping generalizations about him, his race, and his attributes and behavior as a Caucasian person.

67. Young expected that Defendants would continue to promote materials that described him in negative terms, as a Caucasian person.

**Effect on the Workplace**

68. Young was aware that his colleagues were taking the EDI trainings around the time that he took the trainings.

69. Young suffered personal stress based on the fact that he knew his colleagues were taking the same EDI trainings, and reviewing both the modules and potentially the other tools and resources which made negative, offensive generalizations about Caucasians like Young.

70. Young suffered personal stress based on the fact that his supervisors and even their supervisors—essentially the highest officials in the Department of Corrections—were insisting that he review, believe, and live by these trainings, and that his colleagues do the same. Young Op., Exhibit 7, at 17 ("Certainly, Mr. Young is correct that the harassment the plaintiff in *Henry* faced constituted official acts of the company <u>and thus was relevant to the court's analysis</u>.") (emphasis added).

71. The trainings came up in conversations among Young's colleagues at work. Young, and, upon information and belief, Young's colleagues, understood that they were obligated to take the training and adhere to it, regardless of any personal resistance.

72. Young knew that adherence to training was strict. Employees within the Department of Corrections are expected to live up to their training. Training in the prison context was meant to be taken seriously, and applied. Young was aware that training was expected to be learned, believed, internalized, and applied every single day on the job.

73. Many of Young's trainings were computer-based. His duty to review these trainings was absolute, and no less meaningful merely because it was taken on a computer. Young's supervisors repeatedly emphasized the importance of faithfully taking trainings and abiding by those various trainings. Employees were expected to consistently act on their training.

74. Young was accustomed to following the rules and the trainings within the prison. Sometimes this involved reading prison policies; other training involved computer-based modules. Whether about the use of force, accommodating visiting prisoners' disabilities, or contraband and apparel policies for visitors, Young faithfully took trainings and applied them.

75. The idea that Young or his colleagues could simply dismiss the training and avoid ongoing duties to apply its principles was absurd to Young. *See also* Exhibit 4, at 15-16 (Module 3) ("Further, the policies set an expectation for all employees that you recognize your bias and strive to remove any influence of bias on your work for the state and your relationships with your colleagues."). The racially discriminatory classifications, stereotypes, and instructions contained in the training materials were expected to be applied in the workplace, creating a severe and pervasive hostile work environment.

76. Young felt isolated at the workplace, knowing that talking to colleagues or objecting to the training would potentially lead to discipline.

77. Young was concerned that even expressing skepticism of the validity of the training would cause him to be accused of racism.

78. Young experienced significant stress surrounding whether his colleagues believed the training to be true, and were applying the training as they interacted with him in the prison setting. Indeed, the trainings themselves contemplated that conversations in the workplace would be

uncomfortable. Exhibit 5, at 9 (Module 4) ("You'll be held to the expectations outlined in this policy."); *id.* at 9 ("Engage in and support respectful dialogue and courageous conversations (even when uncomfortable) about racism, privilege, dominant culture, oppression, and historical trauma.").

79. Young's prison setting even before the trainings was already highly racially charged. On one occasion, a prisoner, an inmate who Young knew to be the leader of a gang, exclaimed "So I hear you're a racist." Young was also subjected to regular insults by prisoners, including accusations related to his race. He expected these to escalate significantly as the training achieved its purposes.

80. Upon information and belief, Young thought that prisoners would also be able to access the EDI training. Such exposure created inherent danger in his position, and completely destroyed his purpose for being employed in the prison setting in the first place.

81. Upon information and belief, Young thought that the general public, including visitors to the prison, would be able to access the EDI training. (This is consistent with many CDHPE materials, including the glossary, being available online).

82. The racially discriminatory nature of the training materials, which classified individuals by race, treated individuals differently based on race, and instructed employees to treat each other differently based on race, directly contributed to a culture of suspicion and distrust in the Department of Corrections.

83. The trainings created a dangerous atmosphere where a failure to adhere to racism and race-based differential treatment could itself result in accusations of racism, or discipline for failing to abide by the training.

84. The trainings added particular stress and challenges when visitors came to the prison. If guards had even a slight suspicion that a visitor was carrying contraband, they had to check them thoroughly. Visitors would often claim they were being searched due to their race and would frequently write complaints. The race-focused ideas from the training made it constantly feel like Young might be written up, with his superiors more likely to credit the complaints due to the EDI concepts. This made it significantly harder for Young to do his assigned job.

85. Young sensed that some of his colleagues viewed him as a racist due to his status as a Caucasian individual. He also considered some of his colleagues to be especially agreeable with respect to the training, and to use the training as leverage to promote racially discriminatory beliefs in the workplace, by challenging others who made innocent comments. *See* Exhibit 5, at 6 (Module 4) ("[U]sing an equity lens in our work is more about expanding our awareness about others and asking more questions to challenge assumptions rather than having all the answers.").

86. Young especially felt harassment based on the idea that the training would force him to treat others differently based on their race, which was contrary to his core personal and ethical beliefs. Young felt that his continued employment would force him to become an accessory to violating his principles and the Constitution. For example, in one incident, a lieutenant and sergeant were involved in disciplining a correctional officer who claimed that his discipline was motivated by race. The officer was reinstated, lending credence to the idea that the training content could absolutely influence personnel decisions.

87. The trainings made Young hesitant to use force with prisoners even in situations where it was justified. In the last several months of his employment, there were several instances where he

needed to use force, but the race-based implications of the training made him second-guess his actions, leading to an unsafe working environment.

88. The trainings caused Young to feel like the State of Colorado was working against him, against prison safety, and against his well-being. James Gillis, a case manager who worked with Young at the prison and was responsible for ensuring prisoners were prepared for release, also expressed concerns about the negative impact of the training on the prison. As Young was leaving his job, Gillis confided in him that he too thought that the training was problematic, and had affected him as well.

89. Young's knowledge that his colleagues were being instructed in the same manner with the same trainings exacerbated his stress in his workplace, and made him think that he had no choice but to resign his position.

90. Young felt a personal responsibility to work with prisoners to become better people, to be civil, and to avoid considering other prisoners as enemies due to their race or skin color. The trainings fundamentally undermined Young's sense of purpose within the Department of Corrections. They caused him to lose confidence that he could succeed in his core personal mission. He also lacked confidence that his employer would support him against frequent, baseless accusations of racism by prisoners and their visitors. This took away a significant part of his motivation to come to work and try to help rehabilitate inmates.

91. The trainings—officially endorsed by the Department of Corrections—shook Young's belief that the prison system wanted to rehabilitate prisoners and to treat their fellow prisoners as equals regardless of race.

92. Young's motivation to work in the prison system was based on his belief that the prisoners could be helped. The trainings destroyed his ability to keep going and stay employed in a difficult work environment.

93. Young and other employees were instructed that they had to comply with the EDI training as a condition of their ongoing employment. *See, e.g.*, Exhibit 2, at 13 (Module 1) ("As employees of the State of Colorado, it's good to remember we are here because we've made a commitment to serve our community.").

94. Those in management positions were required to enforce the discriminatory behaviors described in the trainings. Young knew that disregarding or disobeying official training would not lead to his promotion. This destroyed Young's desire to seek promotions, as he did not want to be put in a position where he would have to enforce the concepts from the trainings. Young expressed his distress about the situation to his wife, other correctional officers, and James Gillis.

95. The idea that the problematic EDI training was a one-time event is nonsensical, as all trainings at the Department of Corrections occurred annually. If employees refused to participate in the trainings, they would be written up. Moreover, the trainings were factored into quarterly performance reviews, which were used to determine promotions. Young was assured that the EDI training and how he incorporated its principles would be part of his performance review. Performance was graded on a 1-3 scale, and the training was expected to be reflected in communications with inmates and staff. This meant that every race-based concept from the training would eventually be factored into his evaluations, adding stress to everything he did. Young knew that many of his colleagues wanted bright futures with CDOC, and thus incorporated the training into their lives.

96. The training affected the prison setting. Indeed, that was its point. Defendants themselves have admitted that the EDI training was intended to "eradicate" race discrimination, "curtail all forms of discrimination," and "advance equity." *See* Brief for Appellees at 3-4, 39, *Young v. Colorado Dep't of Corr.*, 94 F.4th 1242, (10th Cir. Jun. 14, 2023), No. 23-1063. (Exhibit 15). The idea that the training wasn't meant to actually change the workplace—both with colleagues and prisoners alike—or that employees could simply take the training, disagree with it, and move on, is wildly inconsistent with the record. *See, e.g.*, Exhibit 8, STATE_000250-51 ("[Equity] requires eliminating barriers like poverty and <u>repairing injustices</u> in systems such as education, health, <u>criminal justice</u>, and transportation.") (emphasis added).

97. The Tenth Circuit has recognized that the "racial subject matter and ideological messaging in the [EDI] training is troubling on many levels" and "sets the stage for actionable misconduct by organizations that employ them." Young Op., Exhibit 7, at 3. The court further noted that "race-based training programs can create hostile workplaces when official policy is combined with ongoing stereotyping and explicit or implicit expectations of discriminatory treatment." *Id.*

98. While Defendants have asserted that the EDI training was aimed at eradicating discrimination, the extremely biased and inflammatory content of the training materials and the resulting hostile environment for white employees like Young belie any purportedly benign motive. The Tenth Circuit has already recognized that this type of race-based training can "promote racial discrimination and stereotypes within the workplace" and "encourage racial preferences in hiring, firing, and promotion decisions." Young Op., Exhibit 7, at 14.

99. Defendants' contention that the EDI training had a non-discriminatory intent of advancing equity does not negate the racially discriminatory impact of the training on Young and other white

employees. As the Tenth Circuit observed and endorsed, when employers talk about race "with a constant drumbeat of essentialist, deterministic, and negative language, they risk liability under federal law," regardless of the proffered non-discriminatory justification. *Id*. at 21 n.4.

100. Any objective person would experience a hostile work environment based on the fact alleged above. Young Op., Exhibit 7, at 14 ("If not already at the destination, this type of race-based rhetoric is well on the way to arriving at objectively and subjectively harassing messaging.").

**Internal Complaint and Resignation**

101. Young complained to his workplace, filing an internal complaint document.

102. Rather than work with Young to resolve his concerns or find any middle ground, the Department of Corrections fully denied Young's internal complaint, dismissing the idea that the training posed any discrimination concerns.

103. On July 6, 2021, Young was informed that his complaint would not even be investigated by the Office of the Inspector General. *See* Exhibit 16 ("Your report did not establish reasonable cause to indicate the presence of discrimination [or] discriminatory harassment.").

104. Notably, the denial letter addressed to Young does not distinguish between computer-module based training and videos like Redlining or Intersectionality 101. It refers to all of the training as a whole, as "required."

105. Young agonized over the decision to leave for quite a while, as he couldn't see himself having to teach and enforce the discriminatory rules and concepts imposed by the trainings.

106. Two days later, apprised of the fact that his employer was formally refusing to address the hostile work environment, Young gave notice of his resignation from the Department of Corrections.

107. Young timely filed a complaint with the Equal Opportunity Commission on July 13, 2021. *See* Exhibit 17.

108. Young's last day of employment July 22, 2021.

109. Young subsequently supplemented his complaint at the request of the EEOC on July 26, 2021. *See* Exhibit 18.

110. On November 19, 2021, the U.S. Department of Justice, Civil Rights Division, issued a letter informing Young of his right to institute a civil action pursuant to Title VII of the Civil Rights Act of 1964. *See* Exhibit 19 (Right to Sue Letter).

111. Title VII generally prohibits employers, especially state actors, from asking others to engage in race discrimination. *See Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) ("[I]f the Federal Government is prohibited from discriminating on the basis of race, … then surely it is also prohibited from enacting laws mandating that third parties—e.g., employers, whether private, State, or municipal—discriminate on the basis of race.").

112. While employed at the Department of Corrections, Plaintiff was instructed to treat his colleagues differently based on their race and/or sex. Exhibit 5, at 4 (Module 4) ("Typically, women and people of color aren't given as much opportunity to contribute. To challenge this, invite women and members of historically marginalized groups to speak first."); *see id.* at 4 ("It's helpful to share these strategies out loud at the beginning of meetings to serve as guidelines and equip your staff to be more equitable and inclusive.").

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Against Defendant Colorado Department of Corrections)

(Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-2(a)(1))
(Employment Discrimination – Hostile Work Environment)

113. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

114. Title VII precludes employers from engaging in race discrimination, including by holding employers liable for a hostile work environment based on race.

115. During the relevant period, Young was employed by the Defendant, the Colorado Department of Corrections.

116. Young is a member of one of the classes protected by Title VII because he is a Caucasian individual.

117. No employer would dare include in their official corporate training materials the same insulting and humiliating statements about other races besides Caucasians.

118. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created severe racial discrimination against Young, based on his race.

119. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created pervasive racial discrimination against Young, based on his race.

120. When Young complained of the use of racially discriminatory training materials, Defendant dismissed his concerns and his complaint.

121. Defendants knew of the harassing nature of the training materials—Defendants created and implemented the materials, and Young directly objected to their use—yet did nothing to cure the issue.

122. Based on the facts detailed above, Young's workplace was permeated with discrimination, intimidation, ridicule, and insult.

123. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created an abusive working environment, based on race.

124. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—altered the terms, conditions, and privileges of Young's employment.

125. At all times, the racially discriminatory conduct engaged in by Young's employer was unwelcome.

126. The racially discriminatory conduct engaged in by Young's employer unreasonably interfered with his work performance.

127. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—caused Young to perceive the workplace as abusive and hostile, and it was abusive and hostile objectively.

128. Any reasonable person in Young's place would experience a hostile work environment based on race.

129. Young was harassed and intimidated to the point that he no longer felt comfortable working for the Department of Corrections, and ultimately resigned.

130. Young alleges and establishes that the workplace was abusive and hostile based on direct evidence, as opposed to indirect evidence.

131. Based on all of the circumstances, Young suffered a hostile work environment.

**SECOND CLAIM FOR RELIEF**
**(Against Defendants Moses "Andre" Stancil and Jill Hunsaker Ryan)**

(42 U.S.C. § 1981)
(Employment Discrimination – Hostile Work Environment)

132. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

133. Section 1981 protects employees from private race discrimination in the employment context. ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.").

134. "The same substantive standards apply to a hostile work environment claim regardless of whether the plaintiff has brought it under § 1981 or Title VII." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015).

135. Young is a member of one of the classes protected by Section 1981 because he is a Caucasian individual.

136. No employer would dare include in their official corporate training materials the same insulting and humiliating statements about other races besides Caucasians.

137. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created severe racial discrimination against Young, based on his race.

138. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created pervasive racial discrimination against Young, based on his race.

139. Based on the facts detailed above, Young's workplace was permeated with discrimination, intimidation, ridicule, and insult.

140. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created an abused working environment, based on race.

141. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—altered the terms, conditions, and privileges of Young's employment.

142. When Young complained of the use of racially discriminatory training materials, Defendant dismissed his concerns and his complaint.

143. Defendants knew of the harassing nature of the training materials—Defendant created and implemented the materials, and Young directly objected to their use—yet did nothing to cure the issue.

144. At all times, the racially discriminatory conduct engaged in by Young's employer was unwelcome.

145. The racially discriminatory conduct engaged in by Young's employer unreasonably interfered with his work performance in the racially charged environment of a prison setting.

146. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—caused Young to perceive the workplace as abusive and hostile, and it was abusive and hostile objectively.

147. Any reasonable person in Young's place would experience a hostile work environment based on race.

148. Young was harassed and intimidated to the point that he no longer felt comfortable working for the Department of Corrections, and ultimately resigned.

149. Based on all of the circumstances, Young suffered a hostile work environment.

## THIRD CLAIM FOR RELIEF
## (Against All Defendants)

(Employment Discrimination -- Constructive Discharge)

150. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

151. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—were illegal.

152. The training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—were racially discriminatory.

153. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace made Young's working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.

154. The conditions of Young's employment were objectively intolerable.

155. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace made Young's job so unattractive and unpleasant as to constructively terminate him from his employment.

156. Based on the facts detailed about, Young's workplace was permeated with discrimination, intimidation, ridicule, and insult, causing Young to resign.

157. The racially discriminatory training materials promulgated by Defendants and imposed on the workplace—along with CDOC's refusal to address Young's complaint—created an abused working environment, based on race.

158. Young felt that his continued employment would force him to become an accessory to violating his principles and the Constitution. *Cf. Johnson v. California*, 543 U.S. 499 (2005) (applying a heightened standard of review to racial classifications, even in prisons).

159. Young in fact resigned.

160. Under the circumstances, Young had no choice but to resign.

161. To the extent required by law, Young referred to the principles of constructive discharge in his EEOC charge. Exhibit 17. Young explicitly stated that the discrimination against him was "ongoing," and told the EEOC that "the Charging Party is resigning from his position." In the narrative of the complaint, Young reiterated the causal relationship between the discrimination and his resignation. [*Id.* at 4 ("The effects on Young have been so severe and pervasive that they altered the terms of his working conditions, and constitute one reason that he is resigning from his position."); *id.* at 4 ("His employer's refusal to remedy the situation is partly why he is leaving his position.").].

## RELIEF REQUESTED

Plaintiff respectfully requests that this Court:

162. Find liability against Defendant Colorado Department of Corrections for a violation of Title VII, 42 U.S.C. § 2000e-2(a)(1).

163. Find liability against Defendant Colorado Department of Corrections for a violation of 42 U.S.C. § 1981.

A. Enter a declaratory judgment that Defendants violated 42 U.S.C. § 2000e-2(a)(1) by directly creating, and failing to cure, a racially discriminatory hostile work environment;

B. Enter a declaratory judgment that the Department of Correction's use of racially discriminatory training materials violates Title VII of the Civil Rights Act of 1964;

C. Enter an order permanently enjoining Defendants from continuing to utilize racially discriminatory materials in its mandatory trainings;

D. Award Plaintiff backpay, front pay, and emotional distress damages;

E. Award Plaintiff such costs and attorney fees as allowed by law, including under 42 U.S.C. § 1988; and

F. Grant Plaintiff such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues and claims so triable.

DATED this 3rd day of June, 2024. Respectfully submitted,

*/s/ William E. Trachman*
William E. Trachman, CO Bar #45684
Grady J. Block, CO Bar #55085
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
Facsimile: (303) 292-1980
wtrachman@mslegal.org
dmcdonald@mslegal.org

*Attorneys for Plaintiff Joshua F. Young*