## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
## Judge Nina Y. Wang

Civil Action No. 23-cv-01688-NYW-SBP

JOSHUA F. YOUNG,

  Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,
MOSES "ANDRE" STANCIL, and
JILL HUNSAKER RYAN,

  Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendants' Motion to Dismiss (the "Motion" or "Motion to Dismiss") [Doc. 35, filed July 3, 2024]. The Court has reviewed the Motion, the related briefing, and the applicable case law, and concludes that oral argument would not materially assist in the resolution of this matter. For the reasons set forth herein, the Motion to Dismiss is respectfully **GRANTED**.

## BACKGROUND

***Factual Background.*** The Court takes the following facts from the First Amended Complaint (the "Amended Complaint"), [Doc. 34], and construes the well-pleaded allegations as true for the purposes of this Order. Plaintiff Joshua F. Young ("Plaintiff" or "Mr. Young") previously worked for the Colorado Department of Corrections ("CDOC"). *See, e.g.*, [*id.* at ¶¶ 101–06, 112]. In February 2021, the CDOC announced that all of its employees would be required to take Equity, Diversity, and Inclusion ("EDI") training,

which consisted of several computer modules.  [*Id.* at ¶¶ 7, 9].  Mr. Young took the training

in March 2021.  [*Id.* at ¶ 8].

Plaintiff alleges that the training began with a review of a glossary of terms that

was "assembled by" the Health Equity Office of the Colorado Department of Public Health

and Environment ("CDPHE") and "explicitly meant to be used and adopted by CDOC

employees . . . to further the goals of advancing 'equity.'"  [*Id.* at ¶¶ 10, 13].  Plaintiff

alleges that the glossary "provided . . . the meaning of certain EDI terms in grossly

offensive language, targeted at Caucasian employees specifically."  [*Id.* at ¶ 16].  Mr.

Young highlights the following glossary definitions:

> BIPOC:  Acronym for Black, Indigenous People, and People of Color; the
> term is used to acknowledge that Indigenous and Black people have been
> most impacted by whiteness, both historically and in the present day.  This
> shapes the experiences of and relationship to white supremacy for all
> people of color within a U.S. context.

> Race:  A social construct that artificially groups people by skin tone and
> other physical traits.  The concept, which has no genetic or scientific basis,
> was created and used to justify social and economic oppression of people
> of color by white people.

> White Exceptionalism:  The belief held by some white allies that they are
> the exception to white racism even though they fail to address the implicit
> ways in which they perpetuate white supremacy.  These individuals are
> often more interested in not seeming racist than actually improving the lives
> of people of color.  This is sometimes referred to as **fakequity**.

> White Fragility:  Discomfort and defensiveness, often triggered by feelings
> of fear or guilt, on the part of a white person when confronted by information
> about racial inequality and injustice.

> White Supremacy:  A historically based, institutionally perpetuated system
> of exploitation and oppression of nations and people of color by white
> peoples of European descent for the purpose of establishing, maintaining,
> and defending a system of wealth, power, and privilege.

[*Id.* at ¶¶ 16, 18, 20–22].  Mr. Young alleges that the "trainings also directed further insults at Caucasians" in that it "defined cultural appropriation" by "noting that its occurrence is based on 'white' dominance."  [*Id.* at ¶ 28].  The training also included instruction on a "Bystander Intervention" process, defined as "the act of stepping in and intervening in the moment when a person of lower power and/or status is interrupted, talked over, disregarded, or ignored," [*id.* at ¶ 34 (emphasis and quotation omitted)], which Mr. Young interpreted as a "suggest[ion] to [him] and his colleagues that they need not engage in any intervention if a Caucasian person was interrupted by a non-Caucasian person, given their status and power," [*id.* at ¶ 35].  The EDI training also presented links to "Other Tools & Resources."  [*Id.* at ¶¶ 44–45].  These materials were not required within the training, but "were never labeled 'optional.'"  [*Id.* at ¶ 49].  Plaintiff alleges that these materials "were racially discriminatory and motivated by invidious racial stereotypes and "demeaned and stigmatized [him] and similarly situated individuals based on race and skin color."  [*Id.* at ¶ 52].

Plaintiff alleges that he "expected and knew that EDI training would recur annually" because all CDOC trainings occurred annually.  [*Id.* at ¶¶ 65, 95].  He also alleges that he "expected that the modules on 'EDI' would stay roughly the same, from year to year, in the sense that they would include materials that made sweeping generalizations about him, his race, and his attributes and behavior as a Caucasian person."  [*Id.* at ¶ 66].  Mr. Young also alleges that, generally speaking, employees within the CDOC are "expected to live up to their training"; that "[t]raining in the prison context was meant to be taken seriously, and applied"; and that his supervisors "repeatedly emphasized the importance

of faithfully taking trainings and abiding by those various trainings."  [*Id.* at ¶¶ 72–73].

Employees could be written up for refusing to participate in trainings.  [*Id.* at ¶ 95].

Plaintiff alleges that he "was aware that his colleagues were taking the EDI

trainings around the time that he took the trainings" and that the trainings "came up in

conversations among [his] colleagues at work."  [*Id.* at ¶¶ 68, 71].  He says he was

stressed about "whether his colleagues believed the training to be true[] and were

applying the training as they interacted with him in the prison setting" because he knew

that his co-workers were taking the EDI training and because the training "made negative,

offensive generalizations about Caucasians like Young."  [*Id.* at ¶¶ 69, 78].  He also

alleges that the training "contributed to a culture of suspicion and distrust" in the CDOC

and "created a dangerous atmosphere where a failure to adhere to racism and race-

based differential treatment could itself result in accusations of racism, or discipline for

failing to abide by the training," [*id.* at ¶¶ 82–83], but he does not allege that any such

conduct actually occurred as a result of the training, *see generally* [*id.*].  Plaintiff does

allege that he "sensed that some of his colleagues viewed him as a racist due to his status

as a Caucasian individual."  [*Id.* at ¶ 85].  In addition, he alleges that he "considered some

of his colleagues to be especially agreeable with respect to the training, and to use the

training as leverage to promote racially discriminatory beliefs in the workplace, by

challenging others who made innocent comments," [*id.*], but he provides no specific

examples of this occurring, *see generally* [*id.*].

Plaintiff also details how the EDI training caused him to change his behavior in the

workplace or change his approach in the workplace, alleging that (1) he was worried he

would be written up if he had to search a prison visitor and the visitor claimed that the

search was due to the visitor's race, [*id.* at ¶ 84]; (2) he was hesitant to use force against prisoners, and there were several instances in which he "needed to use force, but the race-based implications of the training made him second-guess his actions, leading to an unsafe environment," [*id.* at ¶ 87]; and (3) he "lacked confidence that his employer would support him against frequent, baseless accusations of racism by prisoners and their visitors," [*id.* at ¶ 90].

Mr. Young filed an internal complaint in response to the EDI training, which was denied. [*Id.* at ¶¶ 101–02]. He later resigned from his employment with the CDOC in July 2021. [*Id.* at ¶ 106].

***Procedural Background.*** On January 19, 2022, Mr. Young filed a lawsuit, against the same Defendants named in this case, based on the EDI training at the CDOC. *See Young v. Colo. Dep't of Corr.*, No. 22-cv-00145-NYW-KLM, 2023 WL 1437894, at \*3 (D. Colo. Feb. 1, 2023). In his amended complaint in that case, he raised one claim asserting a hostile work environment and one Fourteenth Amendment equal protection claim. *Id.* On February 1, 2023, this Court granted the defendants' motion to dismiss and dismissed Mr. Young's claims without prejudice. *See id.* at \*13. Mr. Young appealed the dismissal of his case to the Tenth Circuit. *See Young v. Colo. Dep't of Corr.*, No. 22-cv-00145-NYW-KLM, ECF No. 48 (D. Colo. Mar. 3, 2023).

While Mr. Young's appeal was pending, he filed this separate case. [Doc. 1]. After receiving briefing about the propriety of two cases, based on the same incident, proceeding simultaneously, *see* [Doc. 19; Doc. 22], the Court administratively closed this case until the resolution of Mr. Young's appeal, *see* [Doc. 24]. On March 11, 2024, the Tenth Circuit affirmed the Court's dismissal of the first action. *See Young v. Colo. Dep't*

*of Corr.*, 94 F.4th 1242 (10th Cir. 2024) ("*Young I*").  The Court then reopened this case, *see* [Doc. 28], and Plaintiff filed the Amended Complaint on June 3, 2024, [Doc. 34].

Mr. Young asserts three claims in this case:  (1) a Title VII hostile work environment claim against the CDOC ("Count One"), [*id.* at ¶¶ 113–31]; (2) a hostile work environment claim under 42 U.S.C. § 1981 against Defendants Moses Stancil, the Executive Director of the CDOC, and Jill Hunsaker Ryan, the Executive Director of the CDPHE, in their official capacities ("Count Two"), [*id.* at ¶¶ 3–4, 132–49]; and (3) a constructive discharge claim against all Defendants ("Count Three"), [*id.* at ¶¶ 150–61].  Defendants move to dismiss all of Plaintiff's claims under Rule 12(b)(6).  [Doc. 35].

## LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[W]hen *Iqbal* speaks of a claim's facial plausibility," this means that "the complaint must plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023) (quoting *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014)); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claims "across the line from conceivable to plausible").

In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to

the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quotation omitted). But the Court need not accept "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] formulaic recitation of the elements of a cause of action will not do."). "A conclusory allegation is one in which an inference is asserted without 'stating underlying facts' or including 'any factual enhancement.'" *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023) (quoting *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021)).

## ANALYSIS

Defendants argue that all three of Plaintiff's claims should be dismissed under Rule 12(b)(6). *See generally* [Doc. 35]. Specifically, they argue that both of Plaintiff's hostile work environment claims are insufficiently pled because Plaintiff does not allege facts plausibly establishing that he was subject to race-based harassment or that any such harassment was severe or pervasive. [*Id.* at 7–15]. They argue that these same deficiencies necessitate dismissal of Plaintiff's constructive discharge claim, too. [*Id.* at 15–16]. Mr. Young disagrees. He argues that, in *Young I*, "[t]he Tenth Circuit laid out several markers for how Mr. Young's claims could proceed," [Doc. 43 at 9], and asserts that the operative pleading adequately alleges facts corresponding to those "markers," *see* [*id.* at 10–13]; *see also* [*id.* at 13 ("Mr. Young's complaint closely tracks the Tenth Circuit's guidance describing the delta between his prior complaint and a plausible . . . hostile environment claim.")].[1]

---

[1] Mr. Young asserts in his Response that "[p]leadings are to be liberally construed and if there is any possibility of recovery the case should not be dismissed." [Doc. 43 at 3 (quoting *Gas-A-Car, Inc. v. Am. Petrofina, Inc.*, 484 F.2d 1102, 1107 (10th Cir. 1973))].

I.      **Hostile Work Environment**

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  And 42 U.S.C. § 1981 declares that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  Both Title VII and § 1981 "authorize a plaintiff to bring a claim for hostile work environment based on unlawful race discrimination."  *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015).  Whether asserted under Title VII or § 1981, the standards applicable to a hostile work environment claim are the same.  *Id.*

A workplace is unlawfully hostile when it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

---

*Gas-A-Car* predates the Supreme Court cases setting out applicable pleading standards—*Twombly* and *Iqbal*—by several decades and does not reflect the present requirement that a complaint set forth sufficient facts establishing "more than a sheer possibility that a defendant has acted unlawfully."  *See Iqbal*, 556 U.S. at 678.  In addition, the Tenth Circuit has instructed that parties represented by counsel are not entitled to liberal construction of their pleadings.  *See, e.g.*, *Shue v. Laramie Cnty. Det. Ctr.*, 594 F. App'x 941, 947 (10th Cir. 2014); *Tatten v. City & Cnty. of Denver*, 730 F. App'x 620, 624 (10th Cir. 2018).  The Court is also mindful that, even when litigants are not represented by counsel, it may not act as counsel for a party.  *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) ("[T]he court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record.").  Accordingly, the Court applies the legal standards detailed above, focusing on whether the Amended Complaint contains "sufficient factual matter" to state a claim that is "plausible on its face."  *Iqbal*, 556 U.S. at 678.

*Iweha v. Kansas*, 121 F.4th 1208, 1221 (10th Cir. 2024) (quotation omitted).  A prima facie hostile work environment claim contains the following elements:  (1) the plaintiff is a member of a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on the plaintiff's race; and (4) the severity or pervasiveness of the harassment "altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment."  *Lounds*, 812 F.3d at 1222 (quotation omitted).

Defendants argue, inter alia, that Plaintiff fails to allege facts to satisfy the fourth element of his hostile work environment claims—that he experienced harassment that was so severe or pervasive so as to alter a term or condition of his employment and create an abusive working environment.  [Doc. 35 at 10–15].

To sufficiently allege this element, "[a] plaintiff must allege facts showing that the work environment 'is both subjectively *and* objectively hostile or abusive[.]'"  *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 520 (10th Cir. 2017) (quoting *Lounds*, 812 F.3d at 1222).  "In other words, it is not enough that a particular plaintiff deems the work environment hostile; it must also be of the character that it would be deemed hostile by a reasonable employee under the same or similar circumstances."  *Lounds*, 812 F.3d at 1222.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."  *Iweha*, 121 F.4th at 1221 (quotation omitted).

Severity and pervasiveness "are independent and equal grounds upon which a plaintiff may establish . . . a hostile environment claim."  *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008).  The two grounds "are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless

pattern of lesser harassment that extends over a long period of time also violates the statute." *Brown*, 708 F. App'x at 521 (quotation omitted). There is no "mathematically precise test" used to determine whether a work environment was unlawfully hostile. *Lounds*, 812 F.3d at 1222 (quotation omitted). To determine whether alleged harassment is sufficiently severe or pervasive, courts consider a "variety of factors," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quotation omitted). But "isolated incidents of discriminatory conduct" are "insufficient to support a claim for hostile work environment." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1228 (10th Cir. 2022) (quotation omitted).

### 1.    *Young I*

In *Young I*, the Tenth Circuit concluded that Plaintiff's allegations were insufficient to plausibly plead a severe or pervasive hostile work environment. *Young I*, 94 F. 4th at 1251. The Tenth Circuit observed that Plaintiff had "provide[d] no specific facts, context, or explanation for why or how he was forced to resign" from his position with the CDOC. *Id.* And aside from allegations showing that he "was offended by the EDI training, and that he was upset about the Department's response when he complained about the EDI training," Mr. Young had not set forth any allegations about the effect of the EDI training on his actual workplace environment—such as "what he experienced in the workplace due to the EDI training—particularly his interactions with supervisors and co-workers." *Id.* The Tenth Circuit provided additional examples of the kinds of allegations lacking in Mr. Young's complaint: Mr. Young "[did] not allege that the training occurred more than once,

that his supervisors threatened to punish or otherwise discipline employees who failed to complete or agree with the materials, or that co-workers engaged in specific acts of insult or ridicule aimed at him because of the training." *Id.* Nor did he allege that he was "singled out by other correctional officers for race-based opprobrium," that he was "physically confronted by a co-worker because of his objections to the EDI training," or any "racial animus manifesting itself in Mr. Young's day-to-day *work environment*." *Id.* at 1254. However, the *Young I* majority suggested in a footnote that "[p]erhaps an ongoing, continuing commitment from Mr. Young's supervisors to mandatory EDI trainings with content similar to the one here may evolve into a plausible hostile workplace claim" and that "requiring government employees to either endorse a particular race-based ideological platform or risk losing their jobs could also evolve into a plausible claim of pervasive hostility." *Id.* at 1251 n.2

Defendants contend that the Amended Complaint in this case does not remedy the pleading deficiencies the Tenth Circuit identified in *Young I*. Specifically, Defendants contend that Plaintiff's allegations "simply reiterate that [Plaintiff] was upset by the training, but do not allege objectively severe or pervasive hostility," describing only "his subjective interpretation of how the EDI training may have impacted his workplace." [Doc. 35 at 12]. In his Response, Plaintiff states that he "has responded" to the *Young I* decision by alleging facts matching the Tenth Circuit's "markers" about how his case can proceed. [Doc. 43 at 9–11].

## 2.    Plaintiff's Allegations in this Case

As mentioned above, severity and pervasiveness are assessed by looking at (1) the frequency and severity of the conduct; (2) whether the conduct was physically

threatening or humiliating or was merely an offensive utterance; and (3) whether the conduct unreasonably interfered with the employee's work performance.  *Lounds*, 812 F.3d at 1222.  Mr. Young argues that his Amended Complaint "closely tracks the Tenth Circuit's guidance" in *Young I*, [Doc. 43 at 13], and his defense of the sufficiency of his allegations is framed around the *Young I* decision, *see* [*id.* at 10–13].

First, Plaintiff contends that he has "properly pled" an "ongoing, continuing commitment from Mr. Young's supervisors to mandatory EDI trainings," *see Young I*, 94 F.4th at 1251 n.2, because he has alleged that "all trainings at the Department of Corrections occurred annually" and that he "expected and knew that EDI training would recur annually, as with . . . other training," [Doc. 43 at 10 (quoting [Doc. 34 at ¶¶ 65, 95])]. The frequency of the alleged harassment—here, the EDI training—is one of the factors relevant to the pervasiveness determination.  *Lounds*, 812 F.3d at 1222.  But even crediting Plaintiff's allegations that all CDOC trainings occurred annually and that he *believed* that the EDI training would occur again at some unidentified point in the future, this does not, in the Court's view, plausibly allege an "ongoing, continuing commitment from Mr. Young's supervisors to mandatory EDI trainings," as contemplated in *Young I*. *See* 94 F.4th at 1251 n.2.  Plaintiff does not allege any specific actions taken by his supervisors that would suggest their "ongoing commitment" to the EDI training.[2]  In fact,

---

[2] To be clear, the Court does not hold that pleading facts showing an ongoing commitment from Plaintiff's supervisors (or the other types of allegations mentioned in *Young I*) would automatically be sufficient to state a hostile work environment claim, and the Court does not interpret the *Young I* opinion to hold so, either.  *See Young I*, 94 F. 4th at 1251 n.2 ("*Perhaps* an ongoing, continuing commitment from Mr. Young's supervisors to mandatory EDI trainings with content similar to the one here *may evolve* into a plausible hostile workplace claim. . . .  And requiring government employees to either endorse a particular race-based ideological platform or risk losing their jobs *could also evolve* into a plausible claim of pervasive hostility." (emphasis added)).  "[W]hether certain conduct

the Amended Complaint contains *no* specific factual allegations at all about any actions taken by his supervisors with respect to the EDI training.  *See generally* [Doc. 34].  And notably, Mr. Young's speculative allegation that he "expected and knew" that the EDI training would be required again in the future does not provide any insight into his day-to-day work environment during the spring and early summer of 2021—the time he alleges his workplace was hostile.  *See* [*id.* at ¶¶ 8, 103, 106 (Plaintiff alleging that he took the training in March 2021 and resigned in July 2021)].

Based on the Amended Complaint's allegations, the EDI training—which Plaintiff claims to be the genesis of the alleged harassment, *see, e.g.*, [*id.* at ¶¶ 5, 52, 123–24, 127]—occurred once during Mr. Young's employment, in March 2021, [*id.* at ¶ 8].  Mr. Young does not allege that the messages contained in the EDI training were conveyed to him in the workplace any time after March 2021.  *See generally* [*id.*].

Of course, the frequency of the challenged conduct "is simply one factor in the analysis," and "no single factor is required."  *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  And even a single incident, if "extremely serious," may be sufficient to state a hostile work environment claim.  *Duran v. LaFarge N. Am., Inc.*, 855 F. Supp. 2d 1243, 1248 (D. Colo. 2012) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  But as Plaintiff acknowledges, *see* [Doc. 43 at 14], the Tenth Circuit has already concluded that "the single training session here is not enough," without more, to constitute a hostile work environment.  *Young I*, 94 F.4th at 1251 n.2.  Plaintiff acknowledges that the Court is

---

amounts to severe or pervasive harassment depends on the particular circumstances and context in which such behavior takes place."  *Id.* at 1253.

"bound to accept the holding of the Tenth Circuit," but "preserves for appellate review the issue of whether a single EDI training . . . objectively creates a severely hostile work environment."  [Doc. 43 at 14].  He contends that "the fact that the offensive conduct of the EDI training and its subsequent implementation came from official employer training, rather than remarks by a rogue colleague, makes it more severe" and that "forced adherence to a belief system is much more likely to 'permeate' the workplace with ridicule and insult than comments or slurs."  [*Id.* at 14–15].

While the fact that the EDI training allegedly "constituted official acts of" the employer is relevant to the Court's analysis, *Young I*, 94 F.4th at 1252, Mr. Young does not point the Court to allegations plausibly alleging a *severe* hostile work environment based on the training alone.  "[T]he bar to establish a hostile work environment based on an isolated incident [is] very high."  *Lopez v. Brennan*, No. 2:15-cv-00595-EJF, 2018 WL 4688352, at *6 (D. Utah Sept. 28, 2018).  "[C]ourts have required the conduct to be especially egregious or extreme where only isolated incidents are alleged."  *Morris v. City of Colo. Springs*, 666 F.3d 654, 667 (10th Cir. 2012) (collecting cases in which severity bar was met by single incident, including cases involving sexual assault, rape, and physical assault causing injury).  "Most incidents found to meet this standard involve some kind of physical assault."  *Brown*, 708 F. App'x at 522.  While some courts have concluded that "the use of an unambiguously racial epithet . . . might well [be] sufficient to establish a hostile work environment," *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam) (quotation omitted) (cited favorably in *Lounds*, 812 F.3d at 1230), it is well established that "a plaintiff cannot demonstrate pervasive harassment by pointing to 'a few isolated incidents of racial enmity or sporadic racial slurs.  Instead, there must be

a steady barrage of opprobrious racial comments,'" *Brown*, 708 F. App'x at 522 (quoting

*Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)).  *See, e.g., id.* at 521–

22 (three comments, "while inappropriate and offensive, were not sufficiently pervasive

or extreme to support a hostile work environment claim"); *Chavez v. New Mexico*, 397

F.3d 826, 832 (10th Cir. 2005) ("two racially offensive remarks" fell "far short of the 'steady

barrage' required for a hostile environment claim"); *Juarez v. City & Cnty. of Denver*, No.

23-cv-00409-PAB-NRN, 2024 WL 1156610, at *11 (D. Colo. Mar. 15, 2024) (dismissing

hostile work environment claim where the plaintiff alleged facts about two race-based

comments but "describe[d] no other incidents where [his supervisor] or any other co-

workers or supervisors made discriminatory comments that [the plaintiff] overheard");

*Federspill v. Denver Pub. Sch.*, No. 17-cv-01480-WJM-STV, 2019 WL 13444880, at *4

(D. Colo. Jan. 31, 2019) ("three incidents where [the plaintiff's supervisor] made racial

comments to [the plaintiff]" were insufficient to state a hostile work environment claim),

*report and recommendation adopted*, 2019 WL 13444881 (D. Colo. Mar. 1, 2019); *Sidlo

v. Millercoors, LLC*, 718 F. App'x 718, 728 (10th Cir. 2018) (concluding that "one incident

directly connected to national-origin discrimination" was insufficient to establish a severe

or pervasive environment at summary judgment).

The objective severity of harassment is evaluated "from the perspective of a

reasonable person in the plaintiff's position, considering all the circumstances."  *Harsco

Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007).  While Plaintiff takes issue with

the messages conveyed in the training, "[t]he mere utterance of a statement which

engenders offensive feelings in an employee would not affect the conditions of

employment to a sufficiently significant degree to violate Title VII.'"  *Gross v. Burggraf*

*Constr. Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995) (quotation omitted); *see also Lounds*, 812 F.3d at 1222 (harassment must be both subjectively and objectively severe). Plaintiff has not directed the Court to any allegations raised in this case that were not raised in *Young I* that would change the Tenth Circuit's determination that the single training was not sufficient, alone, to plausibly allege a hostile work environment. *See* [Doc. 43 at 14–15]. Accordingly, the Court concludes that Plaintiff has failed to allege facts plausibly establishing an objectively severe hostile work environment. Plaintiff's remaining arguments focus on pervasiveness, *see* [*id.* at 7–14], and the Court's analysis is limited accordingly.

Next, Plaintiff references the Tenth Circuit's statement that "requiring government employees to either endorse a particular race-based ideological platform or risk losing their jobs could also evolve into a plausible claim of pervasive hostility." *Young I*, 94 F. 4th at 1251 n.2. Plaintiff contends that he "has little difficulty pleading such allegations here" because he alleges that "[e]mployees within the Department of Corrections are expected to live up to their training" while at work; that "[t]raining in the prison context was meant to be taken seriously, and applied"; that his "supervisors repeatedly emphasized the importance of faithfully taking trainings and abiding by those various trainings"; and that he and his co-workers "understood that they were obligated to take the training and adhere to it." [Doc. 43 at 10–11 (quoting [Doc. 34 at ¶¶ 71–73])]. He asserts that even "[w]ithout more" than these allegations, his "claims can survive." [*Id.* at 11].

The cited allegations, however, lack the factual enhancement required to state a plausible claim. *See Matney*, 80 F.4th at 1144 (an allegation is conclusory if it lacks underlying facts or any factual enhancement). Most of the allegations Plaintiff cites are

entirely general, related to the CDOC's general view of "trainings" *as a whole*.  *See, e.g.*,
[Doc. 34 at ¶¶ 72–73].   Allegations asserting that CDOC employees were generally
expected to take their training seriously and abide by them are insufficient to plausibly
allege that Mr. Young and his co-workers were required, *as a condition of their
employment*, to endorse any particular belief or ideology *related to the EDI training*.
Indeed, there are no specific, well-pleaded factual allegations plausibly establishing that
Mr. Young was directed to change his beliefs to mirror the messages conveyed in the EDI
training or risk losing his job, or that "his supervisors threatened to punish or otherwise
discipline employees who failed to complete or agree with the materials."  *Young I*, 94
F.4th at 1251.  Plaintiff's allegation that "[t]he trainings created a dangerous atmosphere
where a failure to adhere to racism and race-based differential treatment could . . . result
in . . . discipline for failure to abide by the training," [Doc. 34 at ¶ 83], is a conclusory
assertion unsupported by factual enhancement.  Indeed, as mentioned above, there are
no allegations that any of Plaintiff's supervisors had *any* conversations with him about the
EDI training.  *See generally* [*id.*].

Plaintiff's other allegations in support of his compelled-belief theory are similarly
devoid of factual support.  For example, Plaintiff alleges that "his supervisors and even
their supervisors—essentially the highest officials in the Department of Corrections—
were insisting that [Plaintiff] review, believe, and live by these trainings, and that his
colleagues do the same," [*id.* at ¶ 70], and that he was "instructed that [he] had to comply
with the EDI training as a condition of [his] ongoing employment," [*id.* at ¶ 93].  But Plaintiff
does not identify who allegedly "insist[ed]" that he needed to "believe[] and live by" the
EDI training, who instructed him that conforming his beliefs was a condition of his

employment, or explain how or when those messages were conveyed. *See* [*id.*].   To the

extent Plaintiff relies on a citation to the training transcripts to provide additional context,

*see* [*id.* at ¶ 93], the quoted statement from the training—"As employees of the State of

Colorado, it's good to remember we are here because we've made a commitment to serve

our community"—does not constitute a well-pleaded factual allegation that Mr. Young and

his fellow employees were told that their employment was conditioned on compliance with

the EDI training's message.  At bottom, these allegations are simply "naked assertion[s]

devoid of further factual enhancement'" that "do not 'raise a right to relief above the

speculative level.'"  *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1173 (10th

Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 555) (alteration in

original).

Next, the *Young I* court observed that Plaintiff had not "plead[ed] sufficient facts

showing that he experienced severe or pervasive harassment in the course of his day-to-

day job."  *Young I*, 94 F4th at 1253.  Allegations about the CDOC's post-training

workplace environment are relevant to whether Plaintiff sufficiently alleges that the EDI

training "unreasonably interfere[d] with [his] work performance" and whether the

environment is "of the character that it would be deemed hostile by a reasonable

employee under the same or similar circumstances."  *Lounds*, 812 F.3d at 1222 (quotation

omitted).  Plaintiff argues his Amended Complaint now contains allegations addressing

his day-to-day work environment.  *See* [Doc. 43 at 11–12].

Specifically, Plaintiff argues that his Amended Complaint contains allegations that

"[h]is colleagues started leveraging the training against him, in order to promote racist

beliefs against" him, [*id.* at 11 (citing [Doc. 34 at ¶ 85])], and that he "was subjected to

regular insults by prisoners related to race, and he expected the insults to keep escalating," [*id.* (citing [Doc. 34 at ¶ 79])].  He also references allegations concerning his own subjective state of mind, e.g., that he "felt isolated, and unable to do exactly what the training insisted that he do—have difficult conversations about race at the workplace," [*id.* (citing [Doc. 34 at ¶ 76])]; that he "lost confidence in his core purpose as an employee," [*id.* at 12 (citing [Doc. 34 at ¶ 90])]; that "[h]e knew that his failure to treat people differently based on race would be factored into both his and his colleagues' quarterly performance reviews, and affect promotions," [*id.* at 11 (citing [Doc. 34 at ¶ 95])]; and that he "perceived that the training was already affecting personnel decisions within the CDOC," [*id.*].  He contends that these allegations are sufficient to "respond[] to the Tenth Circuit's admonitions."  [*Id.*].

As a preliminary matter, Defendants' arguments are focused on whether the workplace was objectively hostile—not whether Mr. Young subjectively perceived the workplace to be hostile to him.  *See* [Doc. 35 at 10 ("This claim fails because it is unsupported by allegations of objective severe or pervasive hostility.")].  Allegations about Mr. Young's subjective feelings about the EDI training, and how he perceived he should act in light of that training, go to whether the EDI training affected *his* work performance— but they provide little insight into the nature of the workplace environment and whether a reasonable person would perceive the workplace as hostile.  *See, e.g.*, [Doc. 34 at ¶¶ 76– 77, 90, 94].  These allegations do not contain facts alleging that, or detailing how, the EDI training actually impacted his workplace, as contemplated in *Young I*.  "[I]t is not enough that a particular plaintiff deems the work environment hostile."  *Lounds*, 812 F.3d at 1222. The Court thus focuses on whether Plaintiff's allegations plausibly allege a workplace that

the workplace that "would be deemed hostile by a reasonable employee under the same or similar circumstances." *Id.*

In doing so, the Court's decision must be based on the allegations in the Amended Complaint—not Plaintiff's reframing of those allegations in his Response. For example, Mr. Young argues in his Response that "[h]is colleagues started leveraging the training against him, in order to promote racist beliefs against Mr. Young." [Doc. 43 at 11 (citing [Doc. 34 at ¶ 85])]. This is not what the Amended Complaint alleges. Rather, Plaintiff alleges that he "*considered* some of his colleagues to be especially agreeable with respect to the training, and to use the training as leverage to promote racially discriminatory beliefs in the workplace, by challenging *others* who made innocent comments," [Doc. 34 at ¶ 85 (emphasis added)]—it does not allege that Plaintiff's co-workers leveraged the training *against Mr. Young*. Plaintiff cannot add new factual allegations in response to a motion to dismiss. *Sudduth v. Citimortgage, Inc.*, 79 F. Supp. 3d 1193, 1198 n.2 (D. Colo. 2015).

Moreover, even considering the allegation as pleaded in the Amended Complaint, Paragraph 85 is vague, conclusory, and lacks the factual enhancement required by *Twombly* and *Iqbal*. Indeed, Mr. Young provides no factual support for this assertion, such as identifying who these colleagues were, explaining *how* they "use[d] the training as leverage" by "challenging others who made innocent comments," or how often this occurred. *See* [Doc. 34 at ¶ 85]. To be sure, there is "no talismanic number of incidents needed to give rise to a hostile discrimination claim," *Tademy*, 614 F.3d at 1143, and a plaintiff "need not establish precise dates for every insult," *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 F. App'x 914, 921 (10th Cir. 2009). But pleading standards

require *some* factual context beyond conclusory allegations, and a plaintiff cannot plausibly allege that their workplace environment was *permeated* with discriminatory ridicule or harassment without giving any factual context into the frequency or type of alleged harassing behavior. *Matney*, 80 F.4th at 1144; *see also Rowe v. Schulte Hosp. Grp., LLC*, No. 5:23-cv-00326-SLP, 2023 WL 4768705, at *3 (W.D. Okla. July 26, 2023) (dismissing hostile work environment claim based on "vague" allegations of sexual harassment where the plaintiff "d[id] not identify the content of the[] statements, when they occurred, how often they occurred or any specific individuals to whom they were made"); *Powell v. McDonough*, No. 20-cv-01223-MV-KK, 2023 WL 2743529, at *4 (D.N.M. Mar. 31, 2023) (dismissing claim where the plaintiff did not allege "any factual detail about the making of th[e offensive] comment, the making of the other derogatory sexual remarks to which the Amended Complaint only generally mentions, the ways in which these comments combined with any other differential treatment that led to her eventual termination, or any other facts that, taken together in their totality, would support a plausible finding or inference of pervasive or severe harassment based on sex").

Similarly, Plaintiff argues in his Response that that "[h]e was subjected to regular insults by prisoners related to race, and he expected the insults to keep escalating." [Doc. 43 at 11 (citing [Doc. 34 at ¶ 79)]].  The single incident referenced in the Amended Complaint occurred *before* Mr. Young participated in the EDI training.  *See* [Doc. 34 at ¶ 79 ("Young's prison setting even before the trainings was already highly racially charged.  On one occasion, a prisoner, an inmate who Young knew to be the leader of a gang, exclaimed 'So I hear you're a racist.'")].  This allegation thus does not provide context into "what [Plaintiff] experienced in the workplace *due to the EDI training*."

*Young I*, 94 F.4th at 1251 (emphasis added).  And Plaintiff's assertion that he "expected these [comments] to escalate significantly as the training achieved its purposes," [Doc. 34 at ¶ 79], addresses only how Mr. Young *expected* his workplace environment to change; it does not provide any insight into whether and how the EDI training *actually affected* his workplace.  In fact, Mr. Young does not cite any example of a race-based comment directed at him after CDOC introduced the EDI training.  *See generally* [*id.*].

Setting aside any unsupported, conclusory allegations that need not be taken as true, the Amended Complaint does not establish "what [Plaintiff] experienced in the workplace due to the EDI training—particularly his interactions with supervisors and co-workers."  *Young I*, 94 F.4th at 1251.  While Plaintiff alleges that the EDI training "came up in conversations among [his] colleagues at work," [Doc. 34 at ¶ 71], this cursory assertion provides no insight into Plaintiff's day-to-day work environment or how it was objectively hostile.  Plaintiff still does not allege, for example, specific facts about "his interactions with supervisors and co-workers" related to the training, that "co-workers engaged in specific acts of insult or ridicule aimed at him because of the training," that he was "singled out by other correctional officers for race-based opprobrium," that he was "physically confronted by a co-worker because of his objections to the EDI training," or that there was any "racial animus manifesting itself in Mr. Young's day-to-day *work environment.*"  *Young I*, 94 F.4th at 1252, 1254.[3]  In sum, while Plaintiff may have sufficiently alleged that the EDI training interfered with his work performance based on

---

[3] The Court does not suggest that these sorts of allegations are necessarily required to state a plausible claim but uses these examples to highlight the lack of allegations describing "what [Plaintiff] experienced in the workplace *due to the EDI training*—particularly his interactions with supervisors and co-workers."  *Young I*, 94 F.4th at 1251 (emphasis added).

*his* subjective reaction to it, he does not allege sufficient objective facts about his workplace to establish that his workplace "would be deemed hostile by a reasonable employee under the same or similar circumstances." *Lounds*, 812 F.3d at 1222.

The Court also considers whether the challenged conduct—the EDI training—was physically threatening. *Id.* Plaintiff does not allege or argue that the EDI training was itself physically threatening; instead, he argues that the EDI training *created* a dangerous working environment because it took place in the prison context. [Doc. 43 at 12–13]. In his Amended Complaint, he alleges that prison visitors who needed to be searched on arrival "would often claim they were being searched due to their race and would frequently write complaints" and that "[t]he race-focused ideas from the training made it constantly feel like [Plaintiff] might be written up, with his superiors more likely to credit the complaints due to the EDI concepts." [Doc. 34 at ¶ 84]. He also alleges that the EDI training made him "hesitant to use force with prisoners" and that "[i]n the last several months of his employment, there were several instances where he needed to use force, but the race-based implications of the training made him second-guess his actions." [*Id.* at ¶ 87].

The context or setting of a workplace is relevant to the Court's analysis. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (the objective inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target"); *see also Semsroth v. City of Wichita*, 304 F. App'x 707, 726 (10th Cir. 2008) (finding prison setting relevant to severity analysis because the alleged harassing conduct—failing to provide backup to corrections officer plaintiff—could have put the plaintiff in danger). But again, Plaintiff's allegations go to his own subjective

reaction to the training and how the training allegedly affected his work performance. And even taking these allegations as true—that the EDI training affected how Plaintiff performed his job and that Plaintiff's hesitancy could have created an unsafe working environment—they are insufficient by themselves to plausibly allege that the workplace was so permeated with discriminatory ridicule and harassment that a reasonable employee would view the workplace as hostile, given the deficiencies addressed above.

***Comparable Cases.*** A few comparator cases highlight the insufficient nature of Plaintiff's allegations here. First, in *De Piero v. Pennsylvania State University*, a professor alleged that he was subjected to a hostile work environment while employed at Penn State based on what the court described as "a series of university-sanctioned professional development meetings and comments from supervisors that addressed racial issues in sweeping, absolute terms." 711 F. Supp. 3d 410, 415–16 (E.D. Pa. 2024). Specifically, the plaintiff alleged that (1) he was required to attend five conferences or trainings over the span of a year and a half that "ascrib[ed] negative traits to white people or white teachers without exception and as flowing inevitably from their race"; (2) a colleague commented to him that "the resistance to wearing masks" is "more likely to be led by white males"; (3) he received an email "instructing Penn State's white employees to 'feel terrible'"; (4) he received "multiple emails urging him to watch a video titled 'White Teachers Are a Problem,'" and (5) when he complained about this conduct to the associate director of Penn State's Affirmative Action Office, she told him that there was a "problem with the white race." *Id.* at 423. The court concluded that "[t]aken together, these allegations plausibly amount to 'pervasive' harassment that, at least on a motion to

dismiss, passes muster," and even expressly distinguished the sufficiency of the plaintiff's allegations case from Mr. Young's pleading in *Young I*.  *See id.*

Similarly, in *Diemert v. City of Seattle*, another case involving allegations of a hostile work environment, the plaintiff alleged that he was required to attend mandatory race and social justice training and that, at one training, the facilitators stated that "white people are like the devil" and "white people are cannibals."  689 F. Supp. 3d 956, 960–61 (W.D. Wash. 2023).  In addition to that, he alleged that he was asked by a manager, "What could a straight white male possibly offer our department?"; that he was told by another director-level employee that "all white people have white privilege and are racist"; and that when he reported these comments to his supervisor, "she told him he should step down and that he used his white privilege to retain the position."  *Id.* at 960–61.  He also alleged that his supervisor "'chest bumped' him, got in his face, and told [him] he had white privilege and racist motives."  *Id.* at 961.  The court denied the defendant's attempt to dismiss the claim under Rule 12(b)(6), concluding that because the plaintiff had alleged that his co-workers and supervisors "verbally and physically assaulted him because of his race" and that he was "the target of potentially offensive comments and other abusive actions, also because of his race," he had "pleaded sufficient factual allegations showing a pattern of race-based harassment of a repeated, routine, or generalized nature that affected his ability to do his job."  *Id.* at 963.

Finally, in *Johnson v. Oregon ex rel. Oregon Department of Environmental Quality*, the plaintiff alleged that her employer requiring trainings that "'aggressively promoted' anti-white concepts" by incorporating "negative statements about 'whiteness' or 'white folks,'" such as "endors[ing] the statement '[whiteness] is a death sentence.'"  No. 3:24-

cv-00279-JR, 2024 WL 5038803, at *1–2 (D. Or. Dec. 9, 2024).  The plaintiff also alleged that her employer "rejected policies of equal employment" and "segregated employees based on race by giving non-white employees one paid hour a week to enter 'safe spaces' that were only available for non-white employees."  *Id.* at *2.  Beyond the training, she also alleged that her co-workers made comments "that white employee[s'] accomplishments result from 'unearned privilege,'" that "'white voices are not worth listening to,'" and that "'discrimination against white people is legitimate.'"  *Id.* at *4.  According to that plaintiff, these comments "went on over a period of years, such that ascribing negative characteristics to white people became commonplace at" her workplace. *Id*.

Mr. Young's allegations are distinguishable from the allegations in *De Piero*, *Diemert*, and *Johnson*.  Unlike this case, the plaintiffs in those three cases alleged that, beyond EDI training, they experienced negative race-based comments or actions from their colleagues and/or supervisors in their day-to-day environment over a period of time, which rendered their claims of a pervasive hostile work environment sufficient at the pleading stage.  Here, Mr. Young's well-pleaded allegations remain focused on the training that he found objectionable.  But the "single training session," without any well-pleaded factual allegations detailing how the EDI training affected the workplace or how the workplace was otherwise infected with racial animus, "is not enough" to plausibly allege that Plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Young I*, 94 F.4th at 1249, 1251 n.2 (quotation omitted).

For all of these reasons, the Court agrees that Plaintiff has not stated a plausible hostile work environment claim under either Title VII or § 1981. For this reason, the Motion to Dismiss is **GRANTED** with respect to Counts I and II.

## II.  Constructive Discharge

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quotation omitted). "A claim of constructive discharge therefore has two basic elements": first, the plaintiff must allege "that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign," and second, that he did in fact resign. *Id.* "This standard is objective: the court 'disregard[s] both the employee's subjective view of the workplace environment and the employer's subjective intentions regarding the employee.'" *Sampson v. Kane Is Able, Inc.*, 812 F. App'x 746, 750 (10th Cir. 2020) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005) (alteration in original)).

Defendants move to dismiss Plaintiff's constructive discharge claim, arguing that because he has not sufficiently alleged a hostile work environment, his constructive discharge claim also fails. [Doc. 35 at 15–16]. Though Plaintiff defends the sufficiency of the allegations supporting his constructive discharge claim, Plaintiff does not contest Defendants' assertion that the failure to allege a hostile work environment necessitates dismissal of a constructive discharge claim. *See* [Doc. 43 at 15–17].

The Tenth Circuit has instructed that when a plaintiff "fail[s] to allege facts sufficient to establish a hostile work environment, he necessarily has failed to state a constructive discharge claim based on that environment." *Brown*, 708 F. App'x at 523. A number of courts have dismissed constructive discharge claims after concluding that the plaintiff failed to adequately allege a hostile work environment. *See Marks v. Sessions*, No. 16-cv-02106-WYD-MEH, 2017 WL 4278498, at *6 (D. Colo. Sept. 27, 2017); *Hunt v. Cent. Consol. Sch. Dist.*, 951 F. Supp. 2d 1136, 1216 (D.N.M. 2013); *Brent v. Nike, Inc.*, No. 2:19-cv-00749-RJS, 2021 WL 861276, at *6 (D. Utah Feb. 12, 2021), *report and recommendation adopted*, 2021 WL 858361 (D. Utah Mar. 8, 2021); *Gomez v. Okmulgee Cnty. Crim. Just. Auth.*, No. 6:22-cv-00322-RAW-DES, 2023 WL 4999861, at *6 (E.D. Okla. Aug. 4, 2023); *Pfannenstiel v. Kansas*, No. 5:21-cv-04006-HLT, 2023 WL 4623848, at *16 (D. Kan. July 19, 2023), *aff'd*, No. 23-3145, 2024 WL 3534142 (10th Cir. July 25, 2024).

Following this authority, the Court concludes that because Mr. Young has not stated a hostile work environment claim, he similarly has not stated a claim for constructive discharge. Accordingly, the Motion to Dismiss is **GRANTED** as to Count III.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendants' Motion to Dismiss [Doc. 35] is **GRANTED**;

(2)    Plaintiff's claims are **DISMISSED with prejudice** under Rule 12(b)(6);[4]

---

[4] A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006). Because this is Plaintiff's second attempt to state a claim under Rule 12(b)(6), and because his claims are still deficient despite the

(3)     Defendants are entitled to their costs under Local Rule 54.1 and Federal

        Rule 54; and

(4)     The Clerk of Court is **DIRECTED to TERMINATE** the case.[5]


DATED:  January 27, 2025                    BY THE COURT:

                                            Nina Y. Wang
                                            United States District Judge

---

Tenth Circuit's guidance in *Young I* and despite dozens of additional allegations, the Court concludes that dismissal with prejudice is appropriate.

[5] "Absent a request to amend, a district court may dismiss the action rather than sua sponte granting leave to amend." *Young I*, 94 F.4th at 1256.  Plaintiff has not requested leave to amend his Amended Complaint.  Accordingly, the Court declines to sua sponte grant unrequested relief.